[No. S013840. Apr. 1, 1991.]

KENNEDY WHOLESALE, INC., Plaintiff and Appellant, v.
STATE BOARD OF EQUALIZATION, Defendant and Respondent.

**COUNSEL**

Munger, Tolles & Olson, Ronald L. Olson, Allen M. Katz, Carolyn B. Kuhl, Mark B. Helm, Lester J. Levy, Ball, Hunt, Hart, Brown & Baerwitz,

John R. McDonough, Allan E. Tebbetts, Judith F. Burkey and Agnes H. Mulhearn for Plaintiff and Appellant.

Daniel G. Nauman as Amicus Curiae on behalf of Plaintiff and Appellant.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, N. Eugene Hill, Assistant Attorney General, Richard M. Frank, Robert D. Milam and Floyd D. Shimomura, Deputy Attorneys General, for Defendant and Respondent.

Olson, Connelly, Hagel & Fong, Lance H. Olson, Leroy Y. Fong and George Waters as Amici Curiae on behalf of Defendant and Respondent.

## OPINION

**PANELLI, J.**—We granted review in this case to consider plaintiff's constitutional challenges to Proposition 99, the Tobacco Tax and Health Protection Act of 1988 (codified at Rev. & Tax. Code, § 30121 et seq.). Proposition 99, which the voters approved on November 8, 1988, increases the tax on cigarettes and other tobacco products and allocates the resulting revenue to various tobacco-related problems. The superior court and the Court of Appeal rejected plaintiff's challenges. We affirm.

### FACTS

In 1988 plaintiff Kennedy Wholesale, Inc., a distributor of tobacco products, paid an increased tax of $50,510.49 in compliance with Proposition 99. Having paid under protest, plaintiff applied to the State Board of Equalization (Board) for a refund. When the Board denied the claim, plaintiff filed this action. The superior court granted the Board's motion for judgment on the pleadings, and the Court of Appeal affirmed.

### DISCUSSION

#### A. *Article XIII A, Section 3*

 Plaintiff first contends that Proposition 99 violates article XIII A, section 3, of the California Constitution (hereafter section 3). Under section 3, "any changes in State taxes enacted for the purpose of increasing revenues . . . must be imposed by an Act passed by not less than two-thirds of all members elected to each of the two houses of the Legislature . . . ."

Section 3 was added to the Constitution on June 6, 1978, by Proposition 13, the Jarvis-Gann initiative. (See generally *Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208 [149 Cal.Rptr. 239, 583 P.2d 1281] [upholding Prop. 13] *(Amador Valley)*.)

Plaintiff reads section 3 to mean that only the Legislature can raise taxes. The section, if interpreted in this way, would implicitly limit the expressly reserved power of initiative.[1] Respondent, in contrast, interprets section 3 to impose a supermajority voting requirement on the Legislature while leaving the people's power of initiative unchanged.

Section 3, considered apart from its context and history, is susceptible of the interpretation that plaintiff has proposed. This is because the section literally provides that *"any changes* in State taxes . . . *must be imposed by an Act passed by* not less than two-thirds of . . . *the Legislature . . . ."* (Italics added.) The words *"any changes* in State taxes" could, of course, be read to include changes by statutory initiative.

Plaintiff claims that we must enforce section 3 according to its "plain meaning" without considering the section's history or other indications of the voters' intent. (See, e.g., *Mutual Life Ins. Co.* v. *City of Los Angeles* (1990) 50 Cal.3d 402, 407 [267 Cal.Rptr. 589, 787 P.2d 996].) Section 3, however, is ambiguous when read in the context of the whole Constitution. In article IV, section 1, of the Constitution, the people expressly "reserve to themselves the powers of initiative and referendum." To interpret section 3 as giving the Legislature *exclusive* power to raise taxes would implicitly repeal article IV, section 1, pro tanto. Section 3, however, does not even mention the initiative power, let alone purport to restrict it.

Section 3's silence regarding its effect on the reserved power of initiative presents a latent ambiguity. This is because "the law shuns repeals by implication . . . ." *(Board of Supervisors* v. *Lonergan* (1980) 27 Cal.3d 855, 868 [167 Cal.Rptr. 820, 616 P.2d 802].) Indeed, "[s]o strong is the presumption against implied repeals that when a new enactment conflicts with an existing provision, '[i]n order for the second law to repeal or supersede the first, the former must constitute a revision of the entire subject, so that the court may say that it was intended to be a substitute for the first.'" *(Ibid.,* quoting *Penziner* v. *West American Finance Co.* (1937) 10 Cal.2d 160, 176 [74 P.2d 252].) Thus, to avoid repeals by implication "we are bound to harmonize . . . constitutional provisions" that are claimed to stand in

---

[1] "The legislative power of this State is vested in the California Legislature which consists of the Senate and Assembly, but the people reserve to themselves the powers of initiative and referendum." (Cal. Const., art. IV, § 1.)

conflict. (*Board of Supervisors* v. *Lonergan, supra,* 27 Cal.3d at pp. 868-869.)
█ In addition, because plaintiff is arguing for a limitation on the initiative power, we must also bear in mind that the initiative power is " ' "one of the most precious rights of our democratic process" ' " (*Amador Valley, supra,* 22 Cal.3d at p. 248, quoting from *Associated Home Builders etc., Inc.* v. *City of Livermore* (1976) 18 Cal.3d 582, 591 [135 Cal.Rptr. 41, 557 P.2d 473, 92 A.L.R.3d 1038]) and that we must *"resolve any reasonable doubts in favor of the exercise of this precious right."* (*Brosnahan* v. *Brown* (1982) 32 Cal.3d 236, 241 [186 Cal.Rptr. 30, 651 P.2d 274], italics in original.)

█ Because section 3 is ambiguous in context, it is appropriate to consider indicia of the voters' intent other than the language of the provision itself. (*Mutual Life Ins. Co.* v. *City of Los Angeles, supra,* 50 Cal.3d at p. 407.) Nothing in the official ballot pamphlet supports the inference that the voters intended to limit their own power to raise taxes in the future by statutory initiative. To the contrary, the arguments in favor of Proposition 13 adopt a populist theme that cannot easily be reconciled with plaintiff's interpretation of the measure. Proponents of Proposition 13 described the measure as directed against "spendthrift politicians" and as "[r]estor[ing] government of, for and by the people." (Ballot Pamp., Proposed Amends. to Cal. Const. with arguments to voters, Primary Elec. (June 6, 1978) p. 59.) If, as the proponents' argument suggests, a preference for direct democracy over the legislative process played a role in motivating the passage of Proposition 13, the conclusion that the voters intended to limit their own power would be difficult to justify.[2]

For the voters to have limited their power in the manner that plaintiff suggests would also have made no sense. Assuming for the sake of argument that section 3 were to prohibit tax increases by statutory initiative, it would still be possible for a simple majority of voters to raise taxes by amending section 3. Initiatives, whether constitutional or statutory, require only a simple majority for passage.[3] (Cal. Const., art. II, § 10, subd. (a).) This fact

---

[2] Several years after the voters approved Proposition 13, amicus curiae briefs were filed in *Calfarm Ins. Co.* v. *Deukmejian* (1989) 48 Cal.3d 805 [258 Cal.Rptr. 161, 771 P.2d 1247] purporting to represent the views of Proposition 13's sponsors. Petitioner interprets the briefs as "confirm[ing] [the sponsors'] view that section 3 restricted tax increases by initiative." Read closely, however, the briefs do not purport to say anything about the drafters' intent. Instead, the briefs merely advance legal arguments about how section 3 should be interpreted. Moreover, even if such a brief could be read as "an after-the-fact declaration of intent by a drafter of Proposition 13," it would "by no means . . . govern our determination how *the voters* understood the ambiguous provisions." (*Carman* v. *Alvord* (1982) 31 Cal.3d 318, 331, fn. 10 [182 Cal.Rptr. 506, 644 P.2d 192], italics added.)

[3] A petition proposing a constitutional amendment requires the signatures of 8 percent of the number of votes cast in the last gubernatorial election, as opposed to only 5 percent for a

also answers plaintiff's contention that Proposition 13 was intended to ensure that no new tax would be enacted unless it "command[ed] a broad public consensus." A tax increase by statutory initiative, which passes by a simple majority, commands the same broad public consensus as a constitutional initiative.

For these reasons, we reject plaintiff's argument that section 3 implicitly repeals the voters' power to raise taxes by statutory initiative.

Plaintiff argues in the alternative that we should interpret section 3's requirement of a two-thirds vote to apply, implicitly, to the electorate. This interpretation, however, would bring section 3 into conflict with article II, section 10, of the Constitution, which expressly provides that an initiative statute takes effect if *"approved by a majority."* (Italics added.) Plaintiff does not address the conflict. Instead, citing *Legislature* v. *Deukmejian* (1983) 34 Cal.3d 658 [194 Cal.Rptr. 781, 669 P.2d 17], plaintiff reasons that the voters' power is presumed to be coextensive with the Legislature's. That opinion, however, does not hold that legislative *procedures*, such as voting requirements, apply to the electorate.

In *Legislature* v. *Deukmejian, supra,* we reaffirmed the "long-established rule that redistricting may occur only once within the 10-year period following a federal census." (34 Cal.3d at p. 663.) Although the relevant constitutional provision expressly referred only to the Legislature,[4] we held that the "once-a-decade" rule amounted to a limitation on the state's lawmaking power, regardless of whether that power is exercised by the Legislature or by the voters. Explaining this conclusion, we stated that "the reserved power to enact statutes by initiative is a legislative power, one that would otherwise reside in the Legislature. It has heretofore been considered to be no greater with respect to the nature and attributes of the statutes that may be enacted than that of the Legislature." (*Legislature* v. *Deukmejian, supra,* 34 Cal.3d at p. 673.)

It is this language from the opinion that plaintiff reads as establishing a "presumption" that the voters' lawmaking power is coextensive with the Legislature's. However, we stated only that the initiative process was "no

petition proposing a statute. (Cal. Const., art. II, § 8, subd. (b).) This distinction, however, does not affect the vote required for an initiative to pass.

Proposition 99, which added a new provision to the state Constitution (Cal. Const., art. XIII B, § 12), qualified for the ballot under the stricter, 8 percent requirement.

[4] "In the year following the year in which the national census is taken under the direction of Congress at the beginning of each decade, the Legislature shall adjust the boundary lines of the Senatorial, Assembly, Congressional, and Board of Equalization districts . . . ." (Cal. Const., art. XXI, § 1.)

greater *with respect to the nature and attributes of the statutes that may be enacted* than that of the Legislature." (*Legislature* v. *Deukmejian, supra,* 34 Cal.3d at p. 673, italics added.) ■ In other words, neither the Legislature nor the voters may enact a law of a nature that exceeds a limitation on the state's lawmaking power, such as the right of free speech (Cal. Const., art. I, § 2, subd. (a)) or the "once-a-decade" limitation on reapportionment (*id.,* art. XXI, § 1; see *Legislature* v. *Deukmejian, supra*). But procedural requirements addressed to the Legislature's deliberations cannot reasonably be assumed to apply to the electorate without evidence that such was intended.[5]

■ Plaintiff also argues that to permit the voters to raise taxes by majority vote would be inconsistent with article XIII A, section 4, which provides that cities, counties, and special districts may impose special taxes "by a two-thirds vote of the qualified electors . . . ." (Cal. Const., art. XIII A, § 4 (hereafter section 4).) Plaintiff interprets section 4 as setting out the exclusive means by which the voters may raise taxes. The argument, however, rests upon an assumption already rejected—that Proposition 13 implicitly repealed the voters' power to raise taxes by statutory initiative. Obviously, section 4 could set out the exclusive means for raising taxes only if the general initiative power had been repealed.

Indeed, section 4 hurts plaintiff's argument more than it helps. This is because the section demonstrates, unambiguously, that the voters knew how to impose a supermajority voting requirement upon themselves when that is what they wanted to do. That the voters *expressly* adopted such a requirement in section 4 strongly suggests that they did not do so *implicitly* in section 3. "Where the electorate has demonstrated the ability to make their intent clear, it is not the province of this court to imply an intent left unexpressed." (*Mutual Life Ins. Co.* v. *City of Los Angeles, supra,* 50 Cal.3d at p. 412.)[6]

Finally on this point, plaintiff argues that our interpretation of section 3 cannot be correct because it would nullify the supposed intent of

---

[5] The electorate does not generally follow "legislative" procedures when exercising the initiative power. Under the Constitution, the people exercise their lawmaking power by presenting a petition to the Secretary of State, rather than by introducing a bill, and by voting on the measure in a general election, rather than in assembly. Moreover, an initiative measure, unlike a legislative act, ordinarily takes effect the day after the election. Finally, the Governor has no veto power over initiatives. (See Cal. Const., art. II, §§ 8, 10.) In each respect, the initiative process differs significantly from the legislative.

[6] This conclusion also draws support from *City and County of San Francisco* v. *Farrell* (1982) 32 Cal.3d 47, 52 [184 Cal.Rptr. 713, 648 P.2d 935], in which we held that "the language of section 4 must be strictly construed . . . so as to limit the measures to which the two-thirds requirement applies."

Proposition 13's drafters to prohibit statutory initiatives increasing real property taxes. Section 3, after barring the Legislature from imposing new taxes of any sort except by a two-thirds vote, adds the following proviso: "except that no new ad valorem taxes on real property, or sales or transaction taxes on the sales of real property may be imposed." According to plaintiff, "if section 3's restriction on increases in non-property taxes does not apply to initiatives, neither does its restriction on increases in property taxes." This is plainly wrong. In expressing an absolute ban on new ad valorem taxes on real property, the proviso to section 3 merely restates article XIII A, section 1,[7] which applies both to the Legislature and to the electorate.

In summary, plaintiff has not demonstrated that the voters who adopted Proposition 13 intended to limit the reserved power of initiative. Because section 3 can reasonably be interpreted not to limit that power, and because *"we are required to resolve any reasonable doubts in favor of the exercise of this precious right"* (*Brosnahan* v. *Brown, supra,* 32 Cal.3d at p. 241, italics in original), we hold that Proposition 99 does not violate section 3.

## B. *The Single-subject Rule*

Plaintiff also contends that Proposition 99 violates the single-subject rule. Under the state Constitution, "[a]n initiative measure embracing more than one subject may not be submitted to the electors or have any effect." (Cal. Const., art. II, § 8, subd. (d).) Proposition 99 violates this rule, plaintiff argues, because the measure permits expenditures that are not necessarily related to problems caused by tobacco use.

We have held that an initiative measure does "not violate the single-subject requirement if, despite its varied collateral effects, all of its parts are 'reasonably germane' to each other." (*Amador Valley, supra,* 22 Cal.3d at p. 230.) The primary stated objective of Proposition 99, which includes all of the others, is "to reduce the economic costs of tobacco use in California . . . ." (Prop. 99, § 2, subd. (e).)[8] The measure represents a coherent effort

---

[7] "The maximum amount of any ad valorem tax on real property shall not exceed One percent (1%) of the full cash value of such property . . . ." (Cal. Const., art. XIII A, § 1, subd. (a).)

[8] The complete text of section 2 of Proposition 99 follows:

"The people find and declare as follows:

"(a) Tobacco use is the single most preventable cause of death and disease in America.

"(b) Tobacco-related diseases create immense suffering and personal loss, and a staggering economic cost which all Californians have to pay.

"(c) Tobacco-related diseases are a major burden on state and local governments by requiring them to provide medical care and health services.

to achieve this objective by (a) raising the tax on tobacco products and (b) directing the increased revenues to areas in which smoking has increased the state's costs.

Under Proposition 99, revenue generated by the increased tax on tobacco products is deposited into a Cigarette and Tobacco Products Surtax Fund (hereafter the fund). (Rev. & Tax. Code, § 30122, subd. (a).) By statute, "[m]oneys in the fund may only be appropriated for the following purposes: (1) Tobacco-related school and community health education programs[;] (2) Tobacco-related disease research[;] (3) Medical and hospital care and treatment of patients who cannot afford to pay for those services, and for whom payment will not be made through any private coverage or by any program funded in whole or in part by the federal government[;] (4) Programs for fire prevention; environmental conservation; protection, restoration, enhancement, and maintenance of fish, waterfowl, and wildlife habitat areas; and enhancement of state and local park and recreation purposes." (*Ibid.*)

Plaintiff argues that Proposition 99 violates the single-subject rule because the measure does not guarantee that *every expenditure* from the fund will be related to tobacco use. To illustrate, moneys from the fund may in some cases be spent to assist indigent medical patients whose health problems are not due to smoking and to improve state parks that have not been damaged by fire.

Obviously, it is possible to imagine expenditures that would fall within Proposition 99's spending categories without addressing tobacco-related problems. However, the measure's spending provisions direct new revenues more precisely to tobacco-related problems than if the electorate had simply omitted any such provisions. We do not believe the voters' failure to require even greater precision invalidates the measure, since it is well established that an initiative may have "collateral effects" without violating the single-subject rule. (*Amador Valley, supra,* 22 Cal.3d at p. 230; see also *Raven* v.

"(d) Tobacco use causes substantial environmental damages, and property damage and loss of life due to fire.

"(e) To reduce the incidence of cancer, heart, and lung disease and to reduce the economic costs of tobacco use in California, it is the intent of the people of California to increase the state tax on cigarettes and tobacco products and do all the following:

"(1) Reduce smoking and other tobacco use among children.

"(2) Support medical research into tobacco-related cancer, heart, and lung diseases.

"(3) Treat people suffering from tobacco-related diseases.

"(4) In recognition of the uncompensated costs of tobacco-related illness, support treatment of patients who cannot afford to pay for services."

*Deukmejian* (1990) 52 Cal.3d 336, 346 [276 Cal.Rptr. 326, 801 P.2d 1077];
*Brosnahan* v. *Brown, supra,* 32 Cal.3d at p. 245.)

Finally, plaintiff argues that Proposition 99 is an example of "logrolling,"
or " 'exploiting' the initiative process by combining in a single measure
several provisions which might not have commanded majority support if
considered separately." (*Amador Valley, supra,* 22 Cal.3d at p. 231.) This
argument is based on the measure's spending provisions, which plaintiff
asserts "were designed to bring together disparate interest groups within the
State: anti-smoking forces, environmentalists, medical groups, and those
concerned about medical care for the poor."

Because Proposition 99 satisfies the single-subject rule, there is no consti-
tutional basis for a separate claim of "logrolling." The single-subject rule is
the method by which the state Constitution guards against that hazard.
Moreover, we have consistently held that the single-subject rule does not
require a showing that each one of a measure's several provisions was
capable of gaining voter approval independently of the remaining provi-
sions. (See *Raven* v. *Deukmejian, supra,* 52 Cal.3d at p. 349; *Brosnahan* v.
*Brown, supra,* 32 Cal.3d at p. 251; *Fair Political Practices Com.* v. *Superior
Court* (1979) 25 Cal.3d 33, 42 [157 Cal.Rptr. 855, 599 P.2d 46]; *Amador
Valley, supra,* 22 Cal.3d at p. 232.) The possibility that some voters objected
to some parts of a measure, as we have previously explained, "is inherent in
any initiative containing more than one sentence . . . . The enactment of
laws whether by the Legislature or by the voters in the last analysis always
presents the issue whether on balance the proposed act's benefits exceed its
shortcomings." (*Fair Political Practices Com.* v. *Superior Court, supra,* 25
Cal.3d at p. 42.)

For these reasons, we hold that Proposition 99 does not violate the single-
subject rule.

DISPOSITION

The decision of the Court of Appeal is affirmed.[9]

Lucas, C. J., Broussard, J., Kennard, J., Arabian, J., and Baxter, J.,
concurred.

---

[9] In view of the disposition, we need not consider plaintiff's arguments regarding the pro-
priety of severing Proposition 99's spending provisions or the retroactivity of a holding inval-
idating the measure.

MOSK, J.—I concur in Justice Panelli's well reasoned opinion.

However, I am concerned about a worst case scenario that is conceivable if the subject of taxes can be considered by initiative. For if a tax increase is permissible through the initiative process, a tax decrease would also be upheld.

It is not within the realm of fantasy that an initiative proposal to repeal state income, sales and related taxes could, with a seductive public relations campaign, obtain sufficient signatures to qualify for the ballot and possibly prevail in an election. The adoption of such a measure would render state government virtually impotent.

Indeed, initiative attempts were undertaken to repeal the personal income tax in 1936 and 1942 and to reduce the sales tax in 1958. (Walker & Smith, *California Corporation and Personal Income Taxes* (1960) 12 Hastings L.J. 1, 2-3.) All three measures failed, but, of course, the same result is not necessarily assured in the future.

My purpose is not to sound a strident alarm, but merely to express a suggestion that the Legislature consider the issue and perhaps propose a constitutional amendment that would appropriately deal with the manner in which taxes may be created or eliminated, increased or decreased.