[No. G029292. Fourth Dist., Div. Three. July 30, 2003.]

HOWARD JARVIS TAXPAYERS ASSOCIATION et al., Plaintiffs and Respondents, v.
COUNTY OF ORANGE et al., Defendants;
CITY OF HUNTINGTON BEACH, Real Party in Interest and Appellant.

## Counsel

Howard, Rice, Nemerovski, Canady, Falk & Rabkin, Steven L. Mayer; Gail Hutton, City Attorney, and Scott F. Field, Assistant City Attorney, for Real Party in Interest and Appellant.

Trevor A. Grimm, Jonathan M. Coupal and Timothy A. Bittle for Plaintiffs and Respondents.

## Opinion

**RYLAARSDAM, J.—** ■ Proposition 13 amended the California Constitution by prohibiting the imposition of ad valorem property taxes in excess of 1 percent of the cash value of property. It contains an exception allowing excess taxes or special assessments "to pay the interest and redemption charges on any … [¶] (1) [i]ndebtedness approved by the voters prior to July 1, 1978." (Cal. Const., art. XIII A, § 1, subd. (b)(1).) The issue in this case is whether passage of a new city charter by the voters of real party in interest City of Huntington Beach (City) in July 1978 constitutes prior voter approval of excess taxation for retirement benefits added after 1978. That charter (1) mandates City's participation in "a retirement system"; (2) gives the city council discretion to "establish such reasonable compensation and fringe benefits as are appropriate [for City employees] by ordinance or resolution"; and (3) expressly provides for an excess tax "sufficient to meet all obligations of the City for the retirement system in which the City participates." We agree with the trial court that excess taxation for the added retirement benefits violates Proposition 13 and affirm the judgment.

### FACTS

The parties stipulated to the facts. The voters of the City approved a charter in 1966. Section 1100 of that charter, entitled "RETIREMENT,"

provides: "Authority and power are hereby vested in the City, its City Council and its several officers, agents, and employees to do and perform any act, and to exercise any authority granted, permitted, or required under the provisions of the State Employees' Retirement Act, as it now exists or hereafter may be amended, to enable the City to continue as a contracting City under the State Employees' Retirement System. The City Council may terminate any contract with ... the State Employees' Retirement System only under authority granted by ordinance adopted by a majority vote of the electors of the City ...."

Section 1207 of the former charter stated: "(a) The City Council shall not levy a property tax for municipal purposes in excess of One Dollar annually on each One Hundred Dollars of the assessed value of taxable property in the City, except as otherwise provided in this Section .... [¶] (b) There shall be levied and collected at the same time and in the same manner as other property taxes for municipal purposes are levied and collected, as additional taxes not subject to the above limitation, if no other provision for payment thereof is made: [¶] ... [¶] 2. A tax sufficient to meet all obligations of the City under the State Employees' Retirement System, the Federal Insurance Contributions Act, or other plan, for the retirement of City Employees, due and unpaid or to become due during the ensuing fiscal year."

In 1976, City's voters approved amendments to the charter prohibiting the city council from taking any action which had "the effect of increasing the amount of tax payable" unless approved by a vote of at least three-fourths of the council. The amendments expressly excluded from this supermajority vote requirement increases in the retirement tax.

In June 1978, City's voters approved a new charter. Some of the provisions which the city council considered "controversial" were presented to the voters as distinct propositions. The remaining provisions of the proposed charter, including those relating to the retirement system and its funding, were combined in "Proposition D." The "City Attorney's Impartial Analysis" described Proposition D as follows: "The existing City Charter contains a number of 'housekeeping' provisions which will be streamlined by approval of Proposition 'D.' The controversial measures, Proposition 'E,' 'F,' 'G,' 'H,' and 'J,' are in no way affected by the vote on Proposition 'D.' There is insufficient space in this analysis to describe in detail each provision of the existing Charter which will be amended by the adoption of Proposition 'D' and therefore, a close reading of the text of the proposed amendments is recommended."

The 1978 charter changed the prior charter by no longer mandating participation in the State Employees' Retirement System, now the Public

Employees' Retirement System (PERS). Instead, the new charter merely provides: "The City shall participate in a retirement system." Additionally, the new charter requires that the council "establish such reasonable compensation and fringe benefits as are appropriate by ordinance or resolution for ... offices, officials and employees except as herein provided." Consistent with the 1966 charter, the new charter specifies that City may impose excess taxes sufficient to meet all its obligations "for the retirement system in which the City participates, due and unpaid or to become due during the ensuing fiscal year." As did the earlier one, the new charter imposes a general requirement that increases in taxes must be approved by 75 percent of the council, but again excludes the retirement tax from the supermajority vote.

Some of City's employees have been members of PERS since 1945; all of them have been members since 1966. Benefits under the plan are funded by a combination of contributions from the public agency employers, contributions from employee members, and earnings from investments made by PERS. The employee contribution rates are set by the Legislature as a percentage of the employee's salary, while the employer contribution rates are set annually, as determined by actuarial valuations based on the employer's retirement formula, the makeup of employee groups, and PERS's earnings on investments.

Since the early 1970's, virtually all City employees have been represented by employee associations; the associations and City have entered into collective bargaining agreements, known as memoranda of understanding (MOU's), which establish employee wages, hours, and working conditions, including retirement benefits.

Between 1970 and the adoption of the 1978 charter, City made several changes liberalizing benefits under the PERS contract. It added survivor's benefits for the families of employees who died prior to retirement, provided for up to four years of military service to count toward PERS benefits, and allowed certain employees' PERS benefits to be based on the employee's single highest year of compensation, rather than an average of the employee's highest three years.

City continued to change its retirement package even after the adoption of its 1978 charter and the passage of Proposition 13. The first of the post-charter changes became effective the same date as Proposition 13. On July 1, 1978, pursuant to previously negotiated MOU's, City began paying part of its employees' portion of retirement contributions. During the ensuing years, as part of new MOU's, City gradually increased the percentage of the employee's portion of contributions it paid until the point where it now pays the employees' full PERS contribution.

In 1987, City also added two new benefits: A "Self-Funded Supplemental Retirement Benefit," initially provided for all employees, now applies only to employees hired before July 1998. A "Medical Insurance Retirement Fund" permits an employee to continue participating in City's health insurance program after retirement, with a portion of the premiums subsidized by City.

In 1999, PERS notified City that its retirement plan was "super-funded," meaning "the actuarial value of assets exceeds the present value of benefits." As a consequence, PERS substantially reduced City's employer contribution for fiscal year 1999–2000. Subsequently, PERS advised City that its employer contribution for fiscal years 2000–2001 and 2001–2002 would be zero. But City remained obligated for the other provisions of its negotiated retirement packages, and it continued to fund at least a portion of those other benefits through the retirement tax override contained in the 1978 charter.

Plaintiffs Howard Jarvis Taxpayers Association and one of its members, Charles Scheid, filed this suit. Scheid is a Huntington Beach resident who paid the property tax override under protest. The complaint seeks a refund of that portion of Scheid's fiscal year 1999–2000 tax override payment that is attributable to retirement benefits, and a declaration prohibiting Huntington Beach from levying a tax override for retirement benefits not already being provided to employees in June 1978.

After trial, the court ruled in plaintiffs' favor, concluding that the voters of Huntington Beach did not intend their approval of the retirement provisions of the 1978 charter "to commit the City to an indebtedness for future enhancements in the type or level of city employee retirement benefits beyond those to which city employees were entitled *at the time of the election*." (Italics added.) The court explained that "[t]he indebtedness approved by Huntington Beach voters prior to July 1, 1978, when they adopted Measure D, was an indebtedness to continue providing all retired, current, and future city employees with the retirement benefits to which city employees were entitled at the time of the election, either through PERS or some other singular retirement system, subject of course to any requirements imposed from time to time by the State Legislature. At the time of the election, the City was providing a PERS pension to all its employees and a PERS survivors' benefit to its firefighters." Consequently, in the absence of what it viewed as voter approval for the subsequently added retirement enhancements, the court concluded that allowing City to levy an excess tax to fund those enhancements violated Proposition 13.

## DISCUSSION

*Interpretation of Charter*

City challenges what it calls the trial court's "cramped interpretation" of the charter language in its finding that the voters "did not intend their approval of [the new charter] to commit the City to an indebtedness for future enhancements in the type or level of city employee retirement benefits beyond those to which city employees were entitled at the time of the election." It contends that this conclusion is supported by neither the text of the charter nor its legislative history. Rather, it argues, charter language stating it may impose excess taxes to satisfy its obligations "for the retirement system" clearly shows the voters empowered City to levy an excess tax to pay for *any* retirement benefit. City's position does not persuade.

■ We review measures adopted by the voters in the same manner as we interpret statutes (see *Hermosa Beach Stop Oil Coalition v. City of Hermosa Beach* (2001) 86 Cal.App.4th 534, 548–549 [103 Cal.Rptr.2d 447]), using a de novo standard (*Be v. Western Truck Exchange* (1997) 55 Cal.App.4th 1139, 1143 [64 Cal.Rptr.2d 527]). When statutory language is clear and unambiguous, we need not construe its meaning. (*Downen's, Inc. v. City of Hawaiian Gardens Redevelopment Agency* (2001) 86 Cal.App.4th 856, 860 [103 Cal.Rptr.2d 644].) Although we regard the language plainly not to support City's position, its interpretation is plausible if looking at the language in a vacuum. Therefore, because the provisions of the charter arguably are ambiguous, we will engage in statutory construction. (*Ibid.*)

■ In interpreting the charter, our charge is "to give effect to the intent of the voters adopting it." (*Diamond International Corp. v. Boas* (1979) 92 Cal.App.3d 1015, 1033–1034 [155 Cal.Rptr. 616].) To do so, we must read the language to harmonize with the object and purpose of the new charter. (*Id.* at p. 1034.) We construe the words from the perspective of the voters, attributing the usual, ordinary, and commonsense meaning to them; we do not interpret them in a technical sense or as terms of art. (*Ibid.*)

City's construction of the charter violates these principles in several respects. Throughout its brief it emphasizes the language that provides for an excess tax sufficient to pay for "*all* obligations of the retirement system ...." City then strains the language well beyond its plain meaning by concluding that "obligations" are the exact equivalent of "benefits," stating, "Approval to pay 'all' obligations obviously reflects the fact that retirement 'obligations'— i.e., benefits—may change over time." (Italics omitted.) A more accurate reading is "all *obligations*," "obligations" being the operative word. (Italics added.) City's obligations do not include benefits added after Proposition 13.

*City of Watsonville v. Merrill* (1982) 137 Cal.App.3d 185 [186 Cal.Rptr. 857] (*Watsonville*) is illustrative. Contrary to City's claim, *Watsonville* did not approve an excess tax "to pay for benefits increased after the effective date of Proposition 13." The case did mention that the city's contracts with PERS had been amended several times, the last after Proposition 13. But, as plaintiffs correctly point out, there are many reasons PERS contracts are amended other than an increase in benefits. Moreover, *Watsonville* found "the additional tax in dispute was necessary to discharge the City's *obligation* to PERS." (*Id.* at p. 194, italics added.) Nothing was said about added benefits.

City relies on *Carman v. Alvord* (1982) 31 Cal.3d 318 [182 Cal.Rptr. 506, 644 P.2d 192] (*Carman*) to support its interpretation. However, it is not persuasive when considered in the factual context of our case. There, in 1948 the voters approved a measure for the city to "fully participate" in the state sponsored retirement system, making the city's employees "members" of the system. (*Id.* at p. 322, fn. 2.) The city was empowered to " 'levy and collect annually, as contemplated in [the statewide statute], a special tax sufficient to raise the amount estimated by [the City] Council to be required to meet ...' " the city's obligations to the retirement system. (*Id.* at p. 322, fn. omitted.) After Proposition 13 was passed, the plaintiff challenged the levy of a tax in excess of the 1 percent maximum to fund the amount due PERS. On appeal, the court found the tax was permissible because it was an "[i]ndebtedness approved by the voters prior to July 1, 1978." (Cal. Const., art. XIII A, § 1, subd. (b) (subdivision (b).)

City stresses the finding in *Carman* that by approving the city's participation in PERS and by authorizing a special tax to fund contributions, the voters "[n]ecessarily ... approved all indebtedness to employees, current and future, that would be incurred." (*Carman, supra,* 31 Cal.3d at p. 326.) Under the facts in *Carman*, that was a logical determination. But the conclusion City draws from that holding is not.

It contends the Huntington Beach voters " 'obviously understood' in 1978 that City's retirement benefits would not remain static ..." and asserts that the rationale in *Carman* as to new employees "applies with equal force to benefits added [thereafter]." However, nothing in *Carman* authorizes an excess levy for new benefits extended after the passage of Proposition 13, even for employees hired before that date. In fact, it supports the opposite conclusion.

The *Carman* court determined that subdivision (b) did not "exempt only traditional, fixed, long-term debt for borrowed funds" as the plaintiff had asserted. (*Carman, supra,* 31 Cal.3d at pp. 325, 327.) Nor was it restricted to "indebtedness which was fixed and certain when approved." (*Id.* at p. 326,

fn. 6.) Instead, the court noted, subdivision (b) "speaks only of the time of approval, not the time an indebtedness is incurred or accrues." (*Ibid.*) However, when the "voters empowered [the city] to offer the pension plan provided by PERS[,] they authorized the special tax set by statute *insofar as necessary* to fund the *obligations*. [Citation.]" (*Id.* at pp. 325–326, italics added.)

City seeks to avoid Proposition 13 by entering into contracts with added benefits funded through or in connection with a "retirement system," classify them as previously approved obligations, and then levy an excess tax to pay for them. *Carman* cautioned against this, prohibiting "open-ended voter approval, given before Proposition 13, to incur any government expense deemed desirable from year to year and to tax accordingly." (*Carman, supra,* 31 Cal.3d at p. 326, fn. 6.) It explained that subdivision (b)'s phrase " 'interest and redemption charges' denotes no more or less than the sums from time to time necessary to avoid default on obligations to pay money, including those for pensions." (*Carman, supra,* 31 Cal.3d at p. 328, fn. omitted.) The purpose of subdivision (b) is "to prevent the impairment of *contracts* approved by the voters in reliance upon the power of the district to levy the tax necessary to fulfill that contract. [Citation.]" (*County of Shasta v. County of Trinity* (1980) 106 Cal.App.3d 30, 40 [65 Cal.Rptr. 18], italics added.) Thus, *Carman* upheld only "a levy for a narrowly defined purpose that necessarily would give rise to payment obligations in the future." (*Carman, supra,* 31 Cal.3d at p. 326, fn. 6.)

Here, City's position is a far cry from "narrowly defined." In the trial court, City asserted that the new charter language gives it the right to levy an excess tax for virtually anything, including "giv[ing] a house ... to every employee as they retire ... [¶] ... as long as it's a retirement related purpose." City's construction of the exception created by subdivision (b) eviscerates Proposition 13. As one court explained in another context, "If we were to accept the City's interpretation ..., we would be turning [Proposition 13] on its head, by narrowly construing the ... requirements and broadly construing the statutory exceptions to it. [Citation.]" (*Shapiro v. San Diego City Council* (2002) 96 Cal.App.4th 904, 924 [117 Cal.Rptr.2d 631].)

City's obligation as authorized by the voters at the time Proposition 13 became effective was to participate in a retirement system. It was not to provide every benefit requested by city employees or advocated by the city council. Assume that the obligation was to provide a transportation system for employees, and Toyotas or Buicks were offered at the time Proposition 13 was enacted. No one could reasonably say City was later authorized to levy an excess tax to provide Ferraris. Yet that philosophy is what City would have us validate.

Under City's interpretation, it would have virtually unfettered power to spend whatever sum of money and levy excess taxes to obtain the revenue, as long as the expenditure was designated "retirement." This was one of the very things Proposition 13 was enacted to combat. And the voters of Huntington Beach obviously favored fetters on City's taxing power. Simultaneously with approving the new charter, 70 percent of them voted in favor of Proposition 13.

We must understand Proposition 13 to be able to properly construe the charter. The Proposition 13 ballot pamphlet stated the measure was "directed against 'spendthrift politicians' and as '[r]estor[ing] government of, for and by the people.' [Citation.]" (*Kennedy Wholesale, Inc. v. State Bd. of Equalization* (1991) 53 Cal.3d 245, 250 [279 Cal.Rptr. 325, 806 P.2d 1360].) Further, its purpose "was to achieve statewide control over escalating local property tax rates." (*City of Rancho Cucamonga v. Mackzum* (1991) 228 Cal.App.3d 929, 945 [46 Cal.Rptr.2d 448, 279 Cal.Rptr. 220].) Its *raison d'être* was to limit municipalities' taxing power.

Subdivision (b), which allows for an excess tax necessary to pay for "[i]ndebtedness approved by the voters prior to July 1, 1978," is an exception to the stringent restrictions of Proposition 13. "An exception to the main premise of a statute is to be strictly construed. [Citation.]" (*People v. Superior Court* (2002) 97 Cal.App.4th 1222, 1228 [119 Cal.Rptr.2d 170].) Thus, City's right to tax is subject to the statewide prohibition on excess taxes. (*Centex Real Estate Corp. v. City of Vallejo* (1993) 19 Cal.App.4th 1358, 1362 [24 Cal.Rptr.2d 48].)

City misses the mark when it asserts there is no evidence to support the trial court's finding the voters "intended to freeze the status quo when they adopted" the new charter. First, we do not read the trial court's ruling the way City presents it. More importantly, the argument begs the question. The issue is not whether the voters expressly intended to maintain the status quo or limit retirement benefits to those in existence at the time the new charter was enacted. The voters did not have to specifically intend to limit the benefits; Proposition 13 did that. For any obligations not approved prior to Proposition 13, the tax is automatically capped, regardless of the charter or the voters' intent. Instead, the voters must intend to authorize a tax in excess of the 1 percent limit for a specific obligation. (Subd. (b).) Preexisting obligations are the exception to Proposition 13; therefore, they must be specific, real, and existing. If they are not, the tax is barred.

Likewise, Proposition 13 prohibits a finding that the voters intended to authorize City to levy a retirement tax in an amount equal to that in effect in June 1978, as City suggests. The voters never approved the amount of the tax. And subdivision (b) speaks of approval of the indebtedness, not the tax.

City maintains the electorate would not have given it discretion to provide "new" retirement benefits, while at the same time denying it the right to levy an excess tax to pay for them. After all, it continues, the voters knew they would have to pay for those benefits somehow. If their intent was to limit taxing authority, the voters would have specified that limit.

But the voters had no opportunity to set a limit. They did not write the language, nor were they given a choice between provisions with or without limitations. And, as we have noted, the voters did not have to intend to or specifically limit the tax; it was limited by Proposition 13.

Moreover, the words of the charter suggest the voters did intend to limit the authority to tax; the operative language is in a section of the charter entitled "TAX LIMITS." "[I]t is well established that ' "chapter and section headings [of an act] may properly be considered in determining legislative intent" [citation], and are entitled to considerable weight. [Citation.]' [Citations.]" (*People v. Hull* (1991) 1 Cal.4th 266, 272 [2 Cal.Rptr.2d 526, 820 P.2d 1036].) It is consistent with the remaining provisions of the charter to interpret this section title to mean the voters did not intend to give City carte blanche to levy a property tax in excess of 1 percent to pay for *all* new retirement benefits.

City also argues the voters must have intended the tax to pay for retirement obligations to also fund the "reasonable compensation and fringe benefits" authorized by the new charter. We disagree. Yes, the charter gives City the right to provide fringe benefits and compensation; but it does not *obligate* it to provide additional retirement benefits. City *may* provide these benefits; it just cannot fund them using an excess levy. Rather, "the employer can provide for the indebtedness in varying ways." (*Carman, supra,* 3 Cal.3d at p. 325.)

Nor is City correct in its assertion that the voters "are presumed to have known" that the PERS contracts had frequently been amended before 1978. The presumption that when voters approve initiatives they are "aware of existing laws and judicial construction thereof" (*In re Lance W.* (1985) 37 Cal.3d 873, 890, fn. 11 [210 Cal.Rptr. 631, 694 P.2d 744]) does not extend to factual information such as amendments to contracts.

Additionally, the language of the charter does not lend itself to City's construction. "As a rule, courts should not presume an intent to legislate by implication. [Citation.]" (*Lubner v. City of Los Angeles* (1996) 45 Cal.App.4th 525, 529 [53 Cal.Rptr.2d 24].) " '[F]or a consequence to be implied from a statute there must be greater justification for its inclusion than a consistency or compatibility with the act from which it is implied. "A

necessary implication within the meaning of the law is one that is so strong in its probability that the contrary thereof cannot reasonably be supposed." ' " (*Woodland Joint Unified School Dist. v. Commission on Professional Competence* (1992) 2 Cal.App.4th 1429, 1451 [4 Cal.Rptr.2d 227], italics omitted.) That condition is absent here. Likewise, we reject as pure speculation City's claim that if the voters had intended to limit the taxing power, someone, i.e., the employee association, would have objected.

The distinction City draws between payments "to" a retirement system and "for" a retirement system is of no consequence. Contrary to its argument, paying "for" a retirement system is not the equivalent of approval to tax for benefits offered after June 1978. So, too, City's interpretation of the charter term "retirement system" as something "constantly changing" does not translate to voter authorization of a tax to pay for later-added benefits.

City challenges what it describes as "[t]he only factual support" for the decision, i.e., that the proposals relating to retirement were grouped together as part of Proposition D, described in the voter pamphlet as "noncontroversial" "housekeeping" provisions. It complains the trial court's "unstated premise" is that a provision authorizing an excess tax to pay for future retirement benefits "would have been sufficiently controversial to warrant separate submission to the voters." That is not how we see it.

Rather, for us to find the voters intended to provide unrestricted power to tax for anything classified as a "retirement benefit," the ballot measure or the voter pamphlet had to make such an explanation. Courts may assume the ballot materials reflected the voters' intent in passing the new charter. (*Trader Sports, Inc. v. City of San Leandro* (2001) 93 Cal.App.4th 37, 49 [112 Cal.Rptr.2d 677].) Here, nothing in Proposition D or the voter information package addressed open-ended tax authority. "Absent some indication that the voters were aware of and intended that result, we cannot adopt a construction that would require that result." (*Woo v. Superior Court* (2000) 83 Cal.App.4th 967, 977 [100 Cal.Rptr.2d 156].) City devotes several pages to a discussion of the intent of the charter revision commission and the city council in drafting the new charter language. It stresses, for example, the change from the draft that it would participate in PERS or several different systems, to the final rendition presented to the voters authorizing City to "participate in a retirement system." It interprets this language to mean the voters gave it authority to select the type of plan and how to fund it, including the excess tax. But, "except in certain 'rare circumstances' [citation], 'the validity of legislative acts must be measured by the terms of the legislation itself, and not by the motives of, or influences upon, the legislators who enacted the measure.' [Citations.]" (*Neecke v. City of Mill Valley* (1995) 39 Cal.App.4th 946, 958 [46 Cal.Rptr.2d 266].) Nothing in the record shows the issue of

"flexibility" was presented to the voters, either in the voter material or in Proposition D itself. And we cannot consider something not before the voters. (See *Carman, supra,* 31 Cal.3d at p. 331, fn. 10 [drafter's "after-the-fact" explanation of intent does not govern our determination of how the voters understood the provision].)

In sum, subdivision (b) is a safety net; it is not an open checkbook. City's expansive interpretation cannot be reconciled with Proposition 13, which "change[d] the previous system of real property taxation and tax procedure by imposing important limitations upon the assessment and taxing powers of state and local government." (*Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization* (1978) 22 Cal.3d 208, 218 [149 Cal.Rptr. 239, 583 P.2d 1281].) Nor does authorization to participate in a retirement system constitute a prior obligation. " 'The term "indebtedness" has no rigid or fixed meaning, but rather must be construed in every case in accord with its context.' [Citations.]" (*Carman, supra,* 31 Cal.3d at p. 326.) In this case, "indebtedness" does not encompass benefits City added after the passage of Proposition 13.

*Motion for New Trial*

City contends the judgment must be reversed, because it requires an impossibility, i.e., PERS's calculation of the pre- and post-July 1978 benefits. In the alternative, it suggests a new trial on that issue alone. (We deny plaintiffs' motion to strike the parts of City's brief dealing with this issue.)

In support of its motion for new trial, City submitted two declarations of Ronald L. Seeling, the Chief Actuary of PERS. He opined that there would be "no practical means to calculate what the City's PERS employer contribution rate would have been during FY 1999–00 had the City provided only those benefits in existence prior to July 1, 1978." He further stated that even determining what portion of the employer contributions is attributable to benefits existing at July 1, 1978 "would impose an exceedingly onerous burden on PERS." He advised the calculations would have to be done "by hand" because the necessary information was not in the database.

However, the amended judgment does not require City to make those calculations for any years before 2000–2001. Therefore, any calculations needed to limit the tax to existing benefits are prospective only.

In denying the motion for new trial, the court discounted this contention, stating: "The court heard the evidence. The court feels that the City has acted improperly .... [T]he argument that this is an impossible situation for PERS or the City to resolve, the court really isn't buying it. [¶] ... [I]t would be

improper not to give the relief requested because the City or PERS is going to have some difficulty in trying to mathematically go back and do what ... the order [requires.]"

■ The trial court has broad discretion in ruling on a motion for new trial, and we will not reverse absent an abuse of discretion. (*Sherman v. Kinetic Concepts, Inc.* (1998) 67 Cal.App.4th 1152, 1160 [79 Cal.Rptr.2d 641].) Our review of the record persuades us the court properly exercised its discretion.

*Statute of Limitations*

City contends the declaratory relief claim is barred by the 30-day statute of limitations set out in Revenue and Taxation Code section 4808. That section provides that a taxpayer may file a declaratory relief action where an illegal or unconstitutional tax directly results from a change in the statute or administrative regulations enacted no more than 12 months before the date the complaint is filed. Thus, City argues, plaintiffs' action filed in December 1999 was more than 20 years' overdue.

Plaintiffs counter that the change in the law triggering the illegal tax was the ordinance City passed in August 1999 levying the retirement tax override at issue. We agree. ■ A city ordinance " 'is the equivalent of a municipal statute ....' [Citation.]" (*California Aviation Council v. City of Ceres* (1992) 9 Cal.App.4th 1384, 1391 [2 Cal.Rptr.2d 163].) The action was filed within six months of enactment of the ordinance and is timely.

*Modification of Judgment*

■ In an action seeking refund of taxes levied by a city and collected by the county on the city's behalf, "any judgment rendered for an assessee shall be entered exclusively against the county ...." (Rev. & Tax. Code, § 5146.) Taxes were collected by defendant County of Orange, and it must refund the overpayment.

## DISPOSITION

The judgment is modified to direct entry of judgment for refund of the overpayment of tax to Charles Scheid against the County of Orange pursuant to Revenue and Taxation Code section 5146, and, as so modified, the judgment is affirmed. Respondents are awarded their costs on appeal.

Sills, P. J., concurred.

**BEDSWORTH, J.**—I respectfully dissent. I believe our Supreme Court's exegesis of the application of Proposition 13 to long-term city obligations in *Carman v. Alvord* (1982) 31 Cal.3d 318 [182 Cal.Rptr. 506, 644 P.2d 192] should inform the analysis of Huntington Beach's retirement benefits in this case. Since I am unconvinced by my colleagues' attempt to distinguish *Carman*, I have no choice but to dissent.

In *Carman v. Alvord, supra,* 31 Cal.3d 318 (*Carmen*), our Supreme Court held that a city's future obligations under its pension plan constituted the type of "indebtedness approved by the voters" which qualifies as an exception to the property tax limitation of Proposition 13. In *Carman,* the voters of the City of San Gabriel had approved the city's participation in PERS in 1948, and empowered the city to " 'levy and collect annually, as contemplated in [the statewide statute], a special tax sufficient to raise the amount estimated by [the City] council to be required to meet the obligations of said City to said retirement system.' " (*Id.* at p. 322.) In the wake of California's passage of Proposition 13, a taxpayer brought a class action alleging that the city's continued levy of an excess tax to fund the retirement system was in violation of article XIII A of the California Constitution.

The court explained that "[c]ourts construe constitutional phrases liberally and practically; where possible they avoid a literalism that effects absurd, arbitrary, or unintended results." (*Carman, supra,* 31 Cal.3d at p. 327.) It then based its conclusion the pension plan was unobjectionable on two bases: "Subdivision (b)'s focus on voter approval implies a concern that irrevocable, long-term obligations, solemnly approved by local electorates and entered on faith in taxing powers then available, not be frustrated by a revolutionary tax limitation imposed from outside the community. [Citations.] It also implies a recognition that failure to create a 'prior debt' exception might lead to problems under the federal contract clause." (*Id.* at p. 328.)

However, the court made clear that the impairment of contract issue was not its paramount concern, and specifically held that the special tax levy could be applied even to benefits voluntarily offered to employees hired *after* the effective date of Proposition 13. "It might be argued that contract clause problems do not arise as to employees hired after the effective date of article XIII A, since they perhaps did not enter service in reliance on City's power to levy the special tax. Yet we see no reason to carve an exception for such persons. We may not assume that subdivision (b) sought to force local governments to the complex calculations necessary to separate their obligations to pre- and post-1978 employees. Article XIII A exempts 'interest and redemption charges on any indebtedness previously *approved* by the electors.' San Gabriel's voters in 1948 obviously understood that subsequently hired employees too would be covered." (*Carman, supra,* 31 Cal.3d at p. 333, fn. 11.)

The court also expressly rejected the suggestion that Proposition 13's exception applied only to indebtedness which was "fixed and certain" at the time of voter approval, noting that "the subdivision imposes no such restriction. It speaks only of the time of approval, not the time an indebtedness is incurred or accrues." (*Carman, supra,* 31 Cal.3d at p. 326, fn. 6.)

In this case, the issue is not whether the excess tax may be levied to cover benefits offered to subsequently hired employees (an issue which respondents understandably concede in light of *Carman*), but whether it may be levied to cover the subsequently added benefits. Under the circumstances of this case, I conclude the Supreme Court's reasoning in *Carman* establishes that it may.

First, I cannot accept respondents' suggestion that the inclusion of the retirement provisions within the noncontroversial Proposition D portion of the proposed 1978 charter concludes the analysis. I am not convinced by respondents' insistence that inclusion somehow indicates that neither the city council nor the voters could have intended to give the council authority to impose taxes for additional retirement benefits negotiated in the future. As the city points out, there is no substantial evidence to support that conclusion. In fact, the city's authority to levy a special tax to fund its retirement system was already a part of its 1968 charter, and although the city was restricted by that charter to participation in PERS (absent approval of the voters to terminate), the city had some ability to make alterations to its benefits even within PERS system—and the record here demonstrates it had done so.

Moreover, while Huntington Beach's voters approved two measures in 1976 which restricted the power of the city council to take actions which had the effect of raising taxes—requiring approval of a supermajority of the council to do so—they expressly excluded the retirement tax from those restrictions. Under these circumstances, I cannot conclude the voters would have considered the possibility of increased taxes to fund future retirement benefits to be particularly controversial.

Indeed, the most substantial retirement-related change made in the 1978 charter was the provision lifting the restriction to participation in PERS, and expressly allowing the city council discretion to set "reasonable" and "appropriate" benefits for the city's employees. But again, I see no basis to conclude that would have been controversial. The new charter does not require any change in the retirement system, and I see no reason why the voters would not appreciate the benefits of allowing the city to "shop around."

In any event, I agree with the city that even assuming the ballot proposition was mislabeled as noncontroversial, that does not mean its provisions should not be enforced according to their language. The city attorney's impartial

analysis specifically exhorted the voters to give the charter amendments a "close reading," and I assume the voters did so prior to casting their votes. Indeed, the fact that 40 percent of the voters opposed Proposition D suggests that they did form their own conclusions about its provisions, rather than blindly accepting the "noncontroversial" label.

The provisions of the 1978 charter expressly granted the city council authority to set "reasonable compensation and fringe benefits as are appropriate" for city officials and employees. Obviously, such authority forecasts future changes in such compensation and benefits, and makes no exception for pension or retirement benefits. The charter also lifts the prior restriction limiting the city's participation to the PERS system, and allows the city to participate in another system. Finally, the charter provides that excess taxes may be imposed "sufficient to meet all obligations of the City for the retirement system in which the City participates, due and unpaid or to become due during the ensuing fiscal year." It does not say, "all existing obligations ..." or even "all obligations in the City's existing retirement plan."

These provisions, taken together, indicate the voters in Huntington Beach intended to grant their city council the discretion to select the best retirement program for the city's employees, to offer benefits that are "reasonable" and "appropriate,"[1] and in the absence of other provision therefor, to fund those benefits (as the city apparently always had) through an excess property tax.

Respondents do not really quarrel with the first two conclusions. They agree that the charter allows the city to participate in other retirement systems of its choosing, and that the electorate gave the council authority to increase the level of benefits offered above those provided in 1978; however, they assert that Proposition 13 prohibits the levy of an excess property tax for such benefits. In other words, respondents suggest the electorate anticipated and approved future changes in the city's retirement system, but could not have approved any tax funding for benefits not already specified. Presumably then, respondents assume the electorate envisioned a bake sale of monumental proportions.

But as the Supreme Court explained in *Carman*, Proposition 13's exemption for excess taxation approved by the voters may be applied to future obligations under a city's retirement plan, *even when those obligations are not yet entered into or known at the time of approval*, as long as the future

---

[1] The majority fails to acknowledge the significance of the provision restricting the council to offering only benefits that are "reasonable" and "appropriate." In my view, that restriction is sufficient to protect the city's taxpayers from the danger that the council might include Ferraris or houses as part of the city's retirement package.

obligations would have been anticipated by the voters. Thus, in *Carman*, the court concluded that because the voters of San Gabriel understood in 1948 that future city employees *would be added* to the city's pension system, those unknown (and uncounted) employees' benefits would be considered as having been approved by the 1948 voters.

Respondents argue that this case does not fall under the reasoning of *Carman*, because while the attrition of old employees and addition of new employees is to be naturally expected and is a "statistical fact of life," the addition of new retirement *benefits* is distinctly *voluntary*. I cannot agree, because the issue in *Carman* was not the mere hiring of new employees, but the extension of pension benefits to them. And while it may be true that a city must naturally hire new employees as older ones leave their employment or retire, it doesn't follow that the city *must* offer those new employees any retirement benefits. It is not obligated to do so, and certainly many people work without such benefits. Thus, the Supreme Court in *Carman* was recognizing not an imperative of governmental biology, but a *likelihood*, understood by the city's voters, that the city would *choose to extend retirement benefits to new employees in the future.*

Unfortunately, the majority, like respondents, ignores this aspect of *Carman* and chooses instead to build its analysis on the purported distinction between "obligations," which can be funded by the tax override provision, and "benefits" voluntarily offered to city employees in the wake of Proposition 13. In my view, this analysis ignores the city's charter provision expressly giving the council continuing discretion to establish reasonable and appropriate fringe benefits. When the council exercises that discretion, the benefits established *are* part of the city's retirement system obligation.

In this case, Huntington Beach's retirement benefits changed several times in the years immediately preceeding the adoption of its 1978 charter. Against that backdrop, I cannot but conclude that the voters' approval of the new charter, expanding the council's authority to make such changes, reflected an understanding that those benefits would continue to change into the future. Thus, the concurrent approval of an excess tax, "sufficient to meet *all obligations of the City for the retirement system in which the City participates"* (italics added), must be construed as a prior approval of payment for those "reasonable" and "appropriate" benefits which the council was authorized to negotiate in the future.

Moreover, the Supreme Court's rejection of the suggestion that Proposition 13 could be construed as "forc[ing] local governments to the complex calculations necessary to separate their obligations to pre- and post-1978 employees" applies equally to the issue of pre- and post-1978 *benefits.* (*Carman, supra*, 31 Cal.3d at p. 333, fn. 11.) In

fact, the trial court's statement of decision highlights that very problem. As appellant points out, the court expressly found that the voters did intend the 1978 charter to authorize the city's participation in a retirement system other than PERS. If the city chose to do so, however, how could it possibly keep track of which portions of an entirely new retirement system would be analogous to the pension benefits offered under PERS in 1978? Would it just be a question of taxing the same amount as allowed by the retirement tax for the PERS pension in 1978? Respondents say "no." They expressly reject the notion that the city is allowed to tax for any pension contribution not expressly owed *in the current year* for the level of benefits offered by PERS in 1978. Thus, under respondents' view, if the city changed retirement systems entirely, the amount for which it could levy an excess tax in future years would be dependent upon enlisting the cooperation of PERS to determine what PERS would be charging for the 1978 benefits under a retirement system which no longer exists. That would seem to present a problem, if not an impossibility. I do not think that is what the voters of Huntington Beach intended.

Finally, because the voter-approved authority at issue here is confined to setting "reasonable" and "appropriate" compensation and fringe benefits for employees, it does not present the scenario of an "open-ended voter approval … to incur any government expense deemed desirable from year to year and to tax accordingly" which was of concern to the Supreme Court in *Carman*. (*Carman, supra,* 31 Cal.3d at p. 326, fn. 6.) Significantly, respondents do not contend that any of the retirement benefits added by Huntington Beach after 1978 are unreasonable or unexpected.

Respondents contend, however, that appellate court cases after *Carman* establish that Proposition 13's exemption for "voter approved indebtedness" can never be applied to authorize a tax levy on any pension system not actually in existence and *specifically* approved by a city's electorate prior to July 1, 1978, and that a charter provision such as the one in this case, giving the city council "open-ended" authority to elect new retirement systems in the future is insufficient as a matter of law to constitute voter approval of the indebtedness. In support of that proposition, respondents rely upon *Valentine v. City of Oakland* (1983) 148 Cal.App.3d 139 [196 Cal.Rptr. 59]. However, *Valentine* says no such thing. In that case, while the city charter in question did authorize the City of Oakland to "join … or continue as a contracting agency in, any retirement or pension system or systems existing or hereafter created under state or federal law" (*id.* at p. 142, fn. 2), the city expressly *disclaimed* any reliance on the provision as establishing voter approval of its subsequent participation in PERS. Thus, the *Valentine* court had no occasion to consider the issue. And as respondents specifically

recognize in another context, " 'cases are not authority for propositions not considered.' " (*American Federation of Labor v. Unemployment Ins. Appeals Bd.* (1996) 13 Cal.4th 1017, 1039 [56 Cal.Rptr.2d 109, 920 P.2d 1314].)

What *Valentine* does establish, however, is that despite the contrary suggestion in *Carman*, Proposition 13's exemption applies to authorize an excess tax levy for any indebtedness approved by the voters, even if the voters did not expressly approve the levy itself: "Once the indebtedness is found to have had the voters' prior approval, ad valorem taxes etc. to pay the obligations arising thereunder are exempt, and there is no express require-ment that such taxes need also be voter approved." (*Valentine v. City of Oakland, supra,* 148 Cal.App.3d at p. 149.) In this case, of course, the taxation itself *was* expressly approved. And that approval, while not required, does emphasize the Huntington Beach voters' express understanding of the implications flowing from their approval of the indebtedness.

The other case relied upon by respondents is *City of Fresno v. Superior Court* (1984) 156 Cal.App.3d 1137 [202 Cal.Rptr. 313]. *City of Fresno* is of little analytical use, however, because while the charter language granting the city council authority to make future changes in the city's pension does appear to be fairly broad, the appellate court construed it as conferring only a very narrow power.

In *City of Fresno*, the voters approved a charter in 1957 which included section 1100, giving the city council authority to " 'establish a fund or funds for the relief and pensioning of all employees of the City of Fresno ...; provided, however, that retirement benefits established by any ordinance existing at the effective date of this Charter shall not be reduced, decreased or diminished.' " (*City of Fresno v. Superior Court, supra,* 156 Cal.App.3d at pp. 1140–1141.) Although the proviso specifically restricts only the lowering of benefits (and hence seems to inferentially approve their increase), the appellate court nonetheless construed it as "limiting the retirement benefits to the benefits established by ordinance as of the date of adoption of section 1100." (*Id.* at p. 1145.) The court further stated that in section 1100 "the voters' approval was limited to 'retirement benefits' and did not include all 'retirement system costs' referred to [in a later ordinance.]" (*Id.* at p. 1143.) But that was also incorrect. Section 1100 authorized creation of a fund or funds for the rather broad purpose of "relief and pensioning of all employees" (*id.* at p. 1140), and used the specific phrase "retirement benefits" only in the proviso setting the *minimum* benefits allowed. Thus, I cannot agree with the *City of Fresno* court's interpretation of the charter provision at issue. Nonetheless, that interpretation, concluding that voters had approved only a very narrow authority to make changes in the city's pension and retirement system was the foundation for the court's

conclusion that retirement benefits and costs approved by ordinance subsequent to the voters' approval of the charter did not qualify for the exemption to Proposition 13. That analysis has no application here.

The record here establishes that as early as its 1966 charter, more than a decade prior to passage of Proposition 13, Huntington Beach had already imposed a general 1 percent limitation on property taxes, subject to specific voter-approved exceptions, including an exception for a tax sufficient to fund the city's retirement obligations. Thus, the passage of Proposition 13, which imposed the same tax limitation on a statewide basis, but also, like Huntington Beach, provided for voter approved exceptions, would presumably have been understood by the Huntington Beach voters as having little *direct* impact on the manner in which taxation was effected in their city.

Thus, the passage of Huntington Beach's 1978 charter, which expressly continued the practice of allowing a special tax levy for retirement benefits in excess of the basic 1 percent tax limitation, while expressly giving the city council authority to set reasonable and appropriate employee benefits in the future, can only be construed as implying voter approval of (and hence taxation for) those reasonable and appropriate benefits offered by the city in the future. Unless I were able to conclude that Proposition 13 operates as a complete prohibition on excess taxation for any pension obligation not specifically *quantifiable or incurred* prior to July 1, 1978 (and in light of *Carman*'s allowance of such taxation for an unknown—and unknowable—number of future city employees to whom benefits were *voluntarily* extended, I cannot) I must conclude that Huntington Beach's 1978 charter was intended to constitute voter approval of all future indebtedness for reasonable and appropriate retirement benefits offered by the city to its employees, regardless of whether the specific benefits offered were known to the voters in 1978.