Filed 8/11/23

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| ALLIANCE SAN DIEGO et al., | D080199 |
| Plaintiffs and Respondents, | |
| v. | (Super. Ct. Nos. 37-2021-00024590-CU-MC-CTL and 37-2021-00024607-CU-MC-CTL) |
| CITY OF SAN DIEGO et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of San Diego County, Kenneth J. Medel, Judge. Reversed and remanded.

Office of the City Attorney, Mara W. Elliott, City Attorney, M. Travis Phelps, Assistant City Attorney, and Tyler L. Krentz, Deputy City Attorney, for Defendant and Appellant City of San Diego.

Colantuono, Highsmith & Whatley, Michael G. Colantuono, Matthew C. Slentz, Abigail A. Mendez, and Vernetra L. Gavin, for Defendant and Appellant Yes! For a Better San Diego.

Strumwasser & Woocher, Fredric D. Woocher, and Julia Michel, for Plaintiffs and Respondents Alliance San Diego, Isidro D. Ortiz, and Michael W. McConnell.

Briggs Law Corporation, Cory J. Briggs, and Janna M. Ferraro, for Plaintiffs and Respondents California Taxpayers Action Network, Donna Frye, and Project for Open Government.

Howard Jarvis Taxpayers Foundation, Jonathan M. Coupal, Timothy A. Bittle, and Laura E. Dougherty, for Plaintiff and Respondent Howard Jarvis Taxpayers Association.

I.

INTRODUCTION

The City of San Diego (the City) placed a citizens' initiative, Measure C, on the ballot for the March 2020 general and special election. Measure C raises occupancy taxes on overnight lodging facilities within the city based on the lodging's location in one of three zones, and its revenues are designated for convention center upgrades, homeless services, and street repairs.

Ballot materials and the ordinance placing Measure C on the ballot (but not the text of Measure C) stated that Measure C required a two-thirds vote to pass, but by March 2020, at least two trial courts in San Francisco had concluded that citizens' initiatives, like Measure C, required only a simple majority. Measure C received 65.24 percent of the votes cast. In April 2020, the City adopted a resolution that stated the number votes for and against Measure C and identified that there was a split of authority about the voter threshold requirement for a citizens' initiative but did not state whether or not Measure C passed.

By April 2021, several appellate courts had concluded a citizens' initiatives required a simple majority, and the City adopted a resolution declaring that Measure C had passed. It also adopted several resolutions to authorize funding based on Measure C's terms.

2

Alliance San Diego (Alliance) filed a verified petition for writ of mandate and complaint for a reverse validation action, seeking a determination that the resolution declaring Measure C passed was invalid, and the City filed a validation action, seeking a determination its funding resolutions and its declaration that Measure C passed were valid. Several individuals and entities filed answers to the City's validation complaint (collectively, the opponents).

The Howard Jarvis Taxpayers Association (HJTA) filed a motion for judgment on the pleadings, which the trial court granted. In its order, the court concluded a two-thirds majority voter threshold applied to Measure C; the failure to apply that threshold violated due process and constituted a "fraud upon the voters"; and the City failed to comply with its duty to declare whether Measure C passed immediately after the election, in 2020. The court entered judgment against the City.

The City and Yes! For a Better San Diego (Yes Committee),[1] which had supported Measure C, contend on appeal that a citizens' initiative must receive a simple majority to pass. Thus, they contend Measure C does not violate Propositions 13 or 218, which require two-thirds of voters. They further contend the court erred by determining a two-thirds voter threshold applied to Measure C and by concluding the City's application of a simple majority voter threshold violated due process or constituted "fraud on the voters." The City and Yes Committee further contend the City did not violate the Elections Code[2] by delaying the announcement of the outcome of

[1] Yes Committee filed an answer to the City's validation complaint, supporting it.

[2] Statutory references are to the Elections Code unless otherwise specified.

3

Measure C, but if it did, the delay does not warrant invalidating Measure C. Finally, they maintain Measure C does not violate Proposition 219, and they contend Measure C is a citizens' initiative. They ask us to direct the trial court to grant them judgment on the pleadings.

We assume, as the trial court did, that Measure C is a citizens' initiative and conclude Propositions 13 and 218 do not apply to it. We also find that application of the simple majority voting requirement did not violate due process or constitute "fraud on the voters," even though ballot materials and the ordinance placing the measure on the ballot stated a two-thirds threshold applied, and that the City's delay in stating Measure C passed does not warrant invalidating it. We further determine that Measure C does not violate Proposition 219. Because we conclude that Measure C was subject to a simple majority, it was error to grant judgment on the pleadings. Thus, we reverse that judgment. However, these determinations are based on the assumption that Measure C is a citizens' initiative, and we find that the record is not sufficiently developed to consider the challenge to that assumption raised by affirmative defense in the California Taxpayers Action Network's (CTAN) answer to the City's validation complaint. Thus, we remand the matter for further proceedings.

II.

BACKGROUND AND PROCEDURAL FACTS

The ballot materials for the March 3, 2020 municipal primary election and municipal special election included Measure C, "Hotel Visitor Tax Increase for Convention Center Expansion, Homelessness Programs and Street Repairs." Measure C qualified for the ballot because it received a sufficient number of valid signatures from registered city voters to qualify as

4

a citizen's initiative. It was promoted by a coalition of homeless rights advocates, civic and community activists, labor unions, and businesses.

Measure C proposed adding a new division 2, "Additional, Voter-Approved Transient Occupancy Tax and Related Bonds" to chapter 3, article 5 of the San Diego Municipal Code. Newly added San Diego Municipal Code section 35.0201, subdivision (a) would increase the city's occupancy tax applied to overnight facilities by between 1.25 and 3.25 percent, depending on the geographic location of the property. The highest increase, 3.25 percent, would be placed on visitors staying at facilities in the general vicinity of downtown San Diego. More central facilities would impose a 2.25 percent increase in the transient occupancy tax, and facilities at the far northern and southern portions of the city would see increased tax rates of 1.25 percent. Measure C would require the additional tax revenues be used for special purpose activities, defined as homelessness programs, street repairs, and convention center improvements, operations, support activities, and business development programs.

Measure C would also authorize the city to issue and sell bonds, to be repaid using the applicable allocated portion of the additional tax revenues, up to specific caps of maximum bond indebtedness. The bonds issued pursuant to Measure C would be limited obligations of the city and payable only from the additional tax revenues.

The substance of Measure C does not state a threshold requirement for voter approval. The voter information pamphlet stated above the official title and summary of Measure C that "passage of this measure requires the affirmative vote of two-thirds of those qualified electors voting on the matter." It described the measure as "the result of a citizens' initiative petition." The ballot summary stated, "[t]he measure authorizes a special

5

tax, meaning the additional revenue is designated for specific purposes and thus requires a two-thirds vote for approval." The city attorney's impartial analysis explained that "[v]oter signatures qualified this citizens' initiative measure for the ballot." The remaining ballot materials, including the full text of Measure C did not address the voter threshold requirement.

The city council adopted Ordinance No. O-21143 on November 4, 2019. That ordinance placed Measure C on the ballot. Ordinance O-21143 states, "Passage of this measure requires the affirmative vote of two-thirds of those qualified electors voting on the matter at the Municipal Special Election."

The election was held on March 3, 2020. The city clerk certified the results, stating that "for said proposition the vote was 239,024 (65.24%)," and "[a]gainst said proposition the vote was 127,349 (34.76%)." The Certificate of the City Clerk (Certificate) also stated that "the total vote was 366,373" and the "proposition requires a two-thirds majority to be adopted by the voters." It did not state that Measure C passed or that it failed.

On April 7, 2020, the city council adopted resolution R-312901 (the April 2020 Resolution). The April 2020 Resolution stated that "declaring the results of a municipal election as certified by the . . . City Clerk is a ministerial act required by California Elections Code section 10263." It also stated that there were 366,373 votes cast upon Measure C in the municipal special election, 239,024 (65.24 percent) of the votes were in favor of Measure C, and 127,349 (34.76 percent) of the votes were against Measure C.

The city staff draft resolution declared Measure C failed. The April 2020 Resolution that the city council ultimately adopted stated that (1) a split of authority existed in California as to whether a simple majority vote or a two-thirds supermajority vote was required for the passage of a special tax proposed by a citizens' initiative; (2) the ballot and the ballot pamphlet stated

6

a two-thirds threshold was required to approve Measure C; and (3) it was anticipated that the California Supreme Court would issue a final decision in the future that would resolve the ambiguity of the threshold requirement applicable to a special tax proposed by a citizens' initiative, a decision which could impact Measure C. It also explained that the statements on the ballot and ballot pamphlet that indicated there was a two-thirds voting requirement to approve Measure C were based on the city attorney's office's determination of the legal precedent and usual practices in California when Measure C was submitted for approval by voters.

By April 2020, two trial courts in San Francisco had concluded that a simple majority vote was required to pass a special tax proposed by a citizens' initiative, and one trial court in Fresno and another in Oakland had concluded that a two-thirds supermajority vote was required.

By April 2021, three appellate courts had issued opinions that concluded a simple majority vote is required to pass a special tax proposed by a citizens' initiative, and the Supreme Court had denied review of two of those cases.[3] (*Howard Jarvis*, *supra*, 60 Cal.App.5th 227, review den.; *City of Fresno v. Fresno Building Healthy Communities* (2020) 59 Cal.App.5th 220, review den. Mar. 30, 2021, S266846 (*Fresno*); *City and County of San Francisco v. All Persons Interested in the Matter of Proposition C* (2020) 51 Cal.App.5th 703, review den. Sept. 9, 2020, S263753 (*Proposition C*).)

On April 6, 2021, the city council passed resolution R-313485 (the April 2021 Resolution), which declared Measure C was approved in the March 3, 2020 election, based on the council's statement of the results in the April

---

[3] The Supreme Court also denied review of the decision in *Howard Jarvis Taxpayers Assn. v. City and County of San Francisco* (2021) 60 Cal.App.5th 227, review den. Apr. 28, 2021, S267516 (*Howard Jarvis*).

2020 Resolution. This resolution superseded the city council's comments regarding Measure C in the April 2020 Resolution. The City also passed resolution R-313486, which authorized and approved the issuance and sale of homelessness program bonds. Also on April 6, 2021, the city council passed resolution R-313487, which authorized and approved the issuance and sale of convention center modernization bonds.

On June 3, 2021, Alliance[4] filed a verified petition for writ of mandate and complaint for a reverse validation action (case No. 37-2021-00024590-CU-MC-CTL) challenging the validity of the April 2021 Resolution, which declared Measure C had been approved, and all the related actions subsequently taken as a result, including resolutions R-313486 and R-313487, addressing bonds. The City filed a timely answer on August 9, 2021.

On June 4, the City filed a validation action (case No. 37-2021-00024607-CU-MC-CTL), seeking to validate its authorization and approval of the bonds as detailed in resolutions R-313486 and R-313487, as well as any actions that could affect the validity of those resolutions, including the determination that Measure C was approved in the April 2021 Resolution.

The court in the validation action signed an order for publication of summons on June 21, 2021, and the summons and complaint were posted. Timely answers were filed by (1) HJTA; (2) CTAN;[5] (3) Alliance; and (4) the Yes Committee. The first three answers denied the allegations and asked the

---

4      Alliance was joined by individual plaintiffs Isidro D. Ortiz, the Board Chair of Alliance, and Michael W. McConnell. We refer to them collectively as Alliance.

5      CTAN was joined by individual defendant Donna Frye and Project for Open Government. We refer to them collectively as CTAN.

court to invalidate Measure C. Yes Committee's answer supported the City's position that Measure C was valid.

On September 15, 2021, the validation and reverse validation actions were consolidated for all purposes.

HJTA and Alliance moved for judgment on the pleadings, arguing that the City informed voters that Measure C would require a two-thirds approval and improperly applied a simple majority. HJTA also argued that Measure C violated Propositions 13, 218, and 219. CTAN joined in the motion.

The court granted judgment on the pleadings. It determined that *Hass v. City Council of the City of Palm Springs* (1956) 139 Cal.App.2d 73 (*Hass*) was controlling and concluded that Ordinance No. O-21143 placing Measure C on the ballot was official legislation that established the rules of the election. Because the ordinance stated that passage of the measure required the affirmative vote of two-thirds of the qualified voters who voted on the matter, the court found that the City changed the rules after the election by reducing the required threshold to a simple majority. The court consequently determined that the adoption of the subsequent resolutions was fundamentally unfair and violated due process. The court also concluded the city council lacked the authority to declare election results without also declaring whether Measure C passed or failed.

The court entered judgment against the City on May 2, 2022, invalidating the April 2021 Resolution and directing the City to refrain from implementing or enforcing Measure C or any resolutions dependent on its passage. The City and Yes Committee filed timely notices of appeal.

9

III.

DISCUSSION

We review a judgment on the pleadings de novo. (*People ex rel. Harris v. Pac Anchor Transportation, Inc.* (2014) 59 Cal.4th 772, 777.) We also independently review trial court decisions about whether a tax meets legal requirements (e.g., *Silicon Valley Taxpayers' Assn., Inc. v. Santa Clara County Open Space Authority* (2008) 44 Cal.4th 431, 449-450), as well as due process questions (*Severson & Werson, P.C. v. Sepehry-Fard* (2019) 37 Cal.App.5th 938, 944.)

With respect to any factual questions, we review the motion for judgment on the pleadings to determine if a complaint states facts sufficient to state a cause of action under any theory. (*Tarin v. Lind* (2020) 47 Cal.App.5th 395, 403-404.)

A. *Measure C Does Not Violate Propositions 13 and 218*

The California Constitution was amended in 1911 to include the initiative power. (*California Cannabis Coalition v. City of Upland* (2017) 3 Cal.5th 924, 934 (*California Cannabis*).) "The initiative is the power of the electors to propose statutes and amendments to the Constitution and to adopt or reject them." (Cal. Const., art. II, § 8, subd. (a).)[6] Viewing the initiative power as a power reserved by the people, courts liberally construe this right. (*California Cannabis*, at p. 934.) "When voters exercise the initiative power, they do so subject to precious few limits on that power." (*Id.* at p. 935, citing *Rossi v. Brown* (1995) 9 Cal.4th 688, 695.) Thus, we "resolve doubts in favor of the exercise of the [initiative] right whenever possible." (*California Cannabis*, at pp. 934, 936.) Further, "procedural requirements imposed on

---

6    Unspecified references to "article" are to the California Constitution.

the Legislature and local governments do not similarly constrain the electorate's initiative power without evidence that such was their intended purpose." (*Id.* at p. 935.) This includes the constitutional requirement that the Legislature obtain a two-thirds vote before raising taxes (art. XIII A, § 3), a requirement that does not apply to voters' initiatives (*California Cannabis*, at p. 935).

Proposition 13 added article XIII A to the state constitution.[7] It contains four provisions. The first two " 'capped the ad valorem real property tax rate at 1 percent (art. XIII A, § 1)' and 'limited annual increases in real property assessment to 2 percent (art. XIII A, § 2).' [Citation.]" (*Proposition C*, *supra*, 51 Cal.App.5th at p. 710.) The third provision "required that any increase in statewide taxes be approved by two-thirds of both houses of the Legislature.' [Citations.]" (*Ibid.*; art. XIII A, § 3.) The fourth provision required " 'that any special tax imposed by a local government entity be approved by two-thirds of the qualified electors [citation].' [Citation.]" (*Proposition C*, at p. 710, citing art. XIII A, § 4.)

Proposition 218 added articles XIII C and XIII D to the state Constitution. (*Citizens for Fair REU Rates v. City of Redding* (2018) 6 Cal.5th 1, 10.) These articles limit the authority of local governments to assess real property taxes and charges, as well as other methods to collect revenue not based on real property value or ownership. (*Ibid.*)

In *Amador Valley Joint Union High School District v. State Board of Equalization* (1978) 22 Cal.3d 208, the Supreme Court upheld the

---

7      We grant HJTA's request for judicial notice of the official ballot titles and summaries of Propositions 13 and 218. We deny its request for judicial notice of an article published by the League of California Cities on August 13, 2017 interpreting *California Cannabis*, *supra*, 3 Cal.5th 924, included in Exhibit 3 to the request for judicial notice.

constitutionality of Proposition 13. (*Id.* at p. 219.) There, the court explained that it liberally construes the power of initiative to promote the democratic process. (*Id.* at p. 219.) Consistent with this view, when construing the term "special tax," a plurality of the Supreme Court in *Los Angeles County Transportation Commission v. Richmond* (1982) 31 Cal.3d 197 (*Richmond*), explained that the language of article XIII, section 4 should be strictly construed, resolving ambiguities "in favor of permitting voters of cities, counties and 'special districts' to enact 'special taxes' by a majority rather than two-thirds vote." (*Richmond*, at p. 205.) The court described Proposition 13 as "fundamentally undemocratic" because it gave one group of voters a greater influence on an election's outcome than another by functionally allowing citizens who oppose a measure to have their vote count double. (*Richmond*, at pp. 204-205.) The same year, the Supreme Court reiterated in *City and County of San Francisco v. Farrell* (1982) 32 Cal.3d 47 (*Farrell*) that "the language of section 4 must be strictly construed and ambiguities therein resolved so as to limit the measures to which the two-thirds requirement applies" when it interpreted the term " 'special district.' " (*Id.* at p. 52.)

The Supreme Court took this approach in *Kennedy Wholesale, Inc. v. State Board of Equalization* (1991) 53 Cal.3d 245 (*Kennedy Wholesale*). There, the court considered whether Proposition 99, a voter initiative which increased the tax on cigarettes and other tobacco products and allocated the revenue to tobacco-related problems, violated article XIII A, section 3, which had been added to the state Constitution by Proposition 13. (*Kennedy Wholesale*, at pp. 248-249.) The plaintiff argued article XIII A, section 3 permitted only the Legislature to raise taxes, but the Supreme Court held Proposition 99 did not violate article XIII A, section 3 because that section

12

could "reasonably be interpreted not to limit that [initiative] power," so Proposition 13 did not limit the power of initiative. (*Kennedy Wholesale*, at pp. 249, 253.)

Following the reasoning of *Kennedy Wholesale,* the Supreme Court in *California Cannabis* held that "article XIII C does not limit voters' 'power to raise taxes by statutory initiative,' " commenting that a different holding "would require an unreasonably broad construction of the term 'local government' at the expense of the people's constitutional right to direct democracy, undermining our longstanding and consistent view that courts should protect and liberally construe it." (*California Cannabis*, *supra*, 3 Cal.5th at p. 931.) Then, in *Proposition C*, the First Appellate District, Division Four compared article XIII A, section 4 to article XIII A, section 3 and followed the Supreme Court's approach in *Kennedy Wholesale* to conclude that the two-thirds vote requirement in article XIII A, section 4 likewise does not apply to local initiatives. (*Proposition C*, *supra*, 51 Cal.App.5th at p. 715.) Explaining that courts have an obligation to harmonize potentially conflicting constitutional provisions when possible, the court indicated that article XIII A, section 4 did not mention and therefore did not restrict the initiative power, and it could not be repealed by implication. (*Proposition C*, at p. 716.)

To support its conclusion, the court in *Proposition C* explained that there was no evidence voters intended to limit their own power to raise taxes because Proposition 13 was directed at politicians and aimed to restore government to the people. (*Proposition C*, *supra*, 51 Cal.App.5th at p. 716, citing *Kennedy Wholesale*, *supra*, 53 Cal.3d at pp. 250-251.) It found relevant the explanation in *Kennedy Wholesale* that article II, section 10 " 'expressly provides that an initiative statute takes effect if "*approved by a majority*." ' "

13

(*Proposition C*, at p. 717, quoting *Kennedy Wholesale*, at p. 251.)  And it noted that the official Proposition 13 ballot materials did not indicate any intention to limit citizens' ability to raise local taxes by initiative and to adopt the initiatives by majority vote.  (*Proposition C*, at pp. 716-717.)

Finally, the *Proposition C* court noted that the Supreme Court has explained ambiguous language in article XIII A must be strictly construed to limit the measures to which the two-thirds supermajority requirement applies.  (*Proposition C, supra*, 51 Cal.App.5th at p. 718; *Kennedy Wholesale, supra*, 53 Cal.3d at p. 252; *Farrell, supra*, 32 Cal.3d 47; *Richmond, supra*, 31 Cal.3d 197.)  It found the principle that ambiguities must be resolved in favor of permitting voters to enact special taxes at odds with a construction of article XIII, section 4 that would expand the reach of the two-thirds requirement to voter initiatives.  (*Proposition C*, at p. 718.)  As the First Appellate District, Division Four later explained in *City and County of San Francisco v. All Persons Interested in the Matter of Proposition G* (2021) 66 Cal.App.5th 1058 (*Proposition G*), the terms " 'Cities, Counties and special districts' " found in article XIII A section 4 "must be construed to refer to these governmental entities exercising their power to tax through an elected board of public officials.  The terms do not reach the electorate exercising its initiative power."  (*Proposition G*, at p. 1070.)

Like article XIII A, section 4, article XIII C, section 2, subdivision (d) does not reference initiative power.  (See *Proposition C, supra*, 51 Cal.App.5th at p. 722.)  Article XIII C, section 2, subdivision (d) provides, "No local government may impose, extend, or increase any special tax unless and until that tax is submitted to the electorate and approved by a two-thirds vote."  Article XIII C references "local government" and defines it to include "any county, city, city and county, including a charter city or county, any

14

special district, or any other local or regional governmental entity," but it does not reference the electorate. (art. XIII C, § 1; see *Proposition C*, at p. 722.) This definition of local government, which was added to the Constitution through Proposition 218, applies to article XIII C, section 2. (*California Cannabis*, *supra*, 3 Cal.5th at p. 943.)

Article XIII C, section 2, subdivision (d) must be interpreted in a manner consistent with article XIII A, section 4 because " 'Proposition 218 is Proposition 13's progeny.' " (*Proposition C, supra*, 51 Cal.App.5th at p. 721.) Thus, like the court in *Proposition C*, we follow controlling precedent and conclude "article XIII C does not include the voting electorate."[8] (*Id* at p. 724, citing *California Cannabis*, *supra*, 3 Cal.5th at pp. 936-940.)

HJTA contends that the Supreme Court's approach of strictly construing Proposition 13 was retracted in *Rider v. County of San Diego* (1991) 1 Cal.4th 1, 5 (*Rider*). (See *Howard Jarvis Taxpayers' Assn. v. State Bd. of Equalization* (1993) 20 Cal.App.4th 1598, 1603.) In *Rider,* the sales tax at issue would have financed the construction and operation of justice facilities, but it did not achieve a two-third majority vote of the county's voters. (*Rider*, at p. 5.) The San Diego County Board of Supervisors created

---

[8] HJTA warns that *Proposition C*'s holding allows government officials to circumvent Proposition 13 by acting as voters to qualify a citizens' initiative with 10 percent of the registered voters and then adopting the initiative in their government capacity without any need for voter approval. (See § 9215 [permitting a legislative body to adopt an ordinance without alteration after initiative petition is certified as having 10 percent of the registered voters].) However, the City's ordinance placing Measure C on the ballot stated that because the council did "not have legal authority under the California Constitution to increase a tax on its own vote, . . . [it] could not grant the initiative petition and adopt its provisions in full." It further concluded that "initiative measures that seek to increase a tax must be submitted to the voters for approval[.]" Thus, it appears that the situation HJTA describes was not present here.

an agency over which it retained control and discretion, created to avoid Proposition 13's two-thirds vote requirement. (*Rider*, at p. 8.) Evidence amply demonstrated the agency was an empty shell acting at the Board of Supervisor's fiscal discretion because the board retained substantial control over operations and expenditures. (*Id.* at pp. 8-9.) Thus, the Supreme Court concluded the agency was a "special district," whose tax impositions required a two-thirds majority. (*Id.* at p. 10.) It reasoned that the intent of Proposition 13 is to restrict the ability of local governments to impose new taxes to replace property tax revenues. That intent would be frustrated if local governments could arrange the formation of local taxing districts to circumvent it. (*Rider*, at pp. 10-11.) But *Rider* did not abandon the principles outlined in *Farrell* and *Richmond* that section 4 should be strictly construed and ambiguities resolved in favor of permitting citizens to enact special taxes by a majority rather than a supermajority. It did not apply limitations to initiative power; it evaluated whether local government acted to circumvent the limitations placed on it by Proposition 13. Moreover, as the court in *Proposition G* explained, there is "no conflict between Proposition 218's liberal construction clause and the maxim of *Richmond and Farrell*, that 'the language of section 4 must be strictly construed and ambiguities resolved in favor of permitting voters of cities, counties and "special districts" to enact "special taxes" by majority rather than two-thirds vote.' " (*Proposition G, supra*, 66 Cal.App.5th at p. 1072.)

HJTA argues that case law following Proposition 13 and predating Proposition 218 confirmed an understanding that a two-thirds requirement applied to all local, special taxes, regardless of how they were proposed. To support this proposition, HJTA explains that citizens' initiative taxes failed for lack of a two-thirds approval in *Altadena Library District v. Bloodgood*

16

(1987) 192 Cal.App.3d 585, and it would likewise have failed in *City of Dublin v. County of Alameda* (1993) 14 Cal.App.4th 264 had the court determined the charge was a tax instead of a fee.  But neither case questioned the application of Proposition 13's two-thirds requirement; they did not consider whether the two-thirds approval requirement applied to citizens' initiatives at all.  (*Proposition G, supra,* 66 Cal.App.5th at pp. 1070-1071; see also *Fresno, supra,* 59 Cal.App.5th at p. 235 [issue of whether voters validly exercised initiative power not at issue in *Altadena*].)  *Altadena* considered "whether Proposition 13's requirement that at least two-thirds of the voters approve new tax levies is constitutional as applied to a library district initiative," and *Dublin* contemplated whether the measure was a special tax.  (*Altadena,* at p. 586; *Dublin,* at pp. 281-284; *Proposition C, supra,* 51 Cal.App.5th at p. 719.)  We do not consider cases for a proposition not explored.  (See *In re Marriage of Cornejo* (1996) 13 Cal.4th 381, 388.)

Instead, as we have explained, case law addressing this issue confirms that citizens' initiatives imposing special taxes need to be approved only by a simple majority.  (*Proposition G, supra,* 66 Cal.App.5th at pp. 1070, 1075; *Howard Jarvis, supra,* 60 Cal.App.5th at p. 230; *Fresno, supra,* 59 Cal.App.5th at p. 231; *Proposition C, supra,* 51 Cal.App.5th at p. 715.)  We, too, conclude that Propositions 13 and 218 do not apply to Measure C.

B. *Measure C Required a Simple Majority Vote*

Separate from their disagreement over the applicability of Propositions 13 and 218, the parties dispute whether the terms of the election set a two-thirds voter threshold for Measure C that the City violated.  Alliance asks us to view the "official pronouncements" that stated a two-thirds majority was required to pass Measure C as controlling the election outcome, and HJTA suggests we focus on the "voter experience" to determine

17

what the voting threshold was in this circumstance. The City and Yes Committee ask us to apply the law in effect at the time of the election.

Alliance urges us to follow the trial court's lead and look to *Hass* for guidance. There, citizens proposed a redistricting ordinance, and when the city failed to act on the proposal, the Supreme Court held that the city council had a duty to either pass the proposed ordinance or put it to a citywide vote. (*Hass*, *supra*, 139 Cal.App.2d at p. 74.) The city then took the ordinance contained in the initiative petition and submitted it to electors, as directed by the Supreme Court. (*Ibid.*) That ordinance, which was drafted by the citizens, included a provision stating that "if three-fourths of the qualified electors voted in favor of the ordinance[,] it was to become effective, . . . " (*Ibid.*) The ballots likewise stated that " 'if three-fourths of the qualified electors, who vote, vote in favor of said Ordinance No. 293[,] it will provide for the redistricting of the presently existing councilmanic districts of the city of Palm Springs,' in the manner described." (*Ibid.*) When the ordinance received a majority of the votes, but less than three-fourths, the city council adopted a resolution declaring that the ordinance was rejected. (*Id.* at p. 75.) The plaintiff filed a writ of mandate to compel the city council to declare the ordinance passed because the law did not require a three-fourths majority vote for redistricting. (*Ibid.*)

The court of appeal did not reach the issue of whether the law required a three-fourths majority because "[t]he provision in the ordinance submitted at the election and stated in the ballots, that a three-fourths majority was required, [was] one which directly affect[ed] the adoption of the entire ordinance." (*Hass*, *supra*, 139 Cal.App.2d at p. 76.) In other words, the substance of the citizen-drafted ordinance established the three-quarter supermajority requirement. Thus, even if the law required only a simple

majority, "the fact remain[ed] that the proposition was not submitted to the voters on that basis. . . . [T]he matter was submitted to the voters in the form and subject to the condition requested by the signers of the initiative petition." (*Ibid.*) Thus, the court of appeal concluded that the ordinance did not pass because the voting threshold contained within the substance of the measure was not met.

The City and Yes Committee direct us to *Jobs & Housing Coalition v. City of Oakland* (2021) 73 Cal.App.5th 505 (*Jobs & Housing*). There, a group of citizens placed a proposed special parcel tax on the ballot, and city officials prepared the corresponding ballot materials. The ballot materials "included statements that the measure needed two-thirds of the vote to pass." (*Id.* at p. 508.) The city auditor's materials also "stated the measure would go into effect 'if adopted by two-thirds of voters.' " (*Id.* at p. 509.) The measure received 62.47 percent of the vote, but the city council adopted a resolution declaring that the measure passed and stating that there was uncertainty about whether a majority or two-thirds vote had been required. (*Ibid.*)

Plaintiffs filed a reverse validation complaint because the measure did not receive two-thirds of the vote. (*Jobs & Housing*, *supra*, 73 Cal.App.5th at p. 509.) They argued that because the ballot materials stated a two-thirds vote was needed, declaring the measure had passed constituted a " 'post hoc bait-and-switch' that 'creat[ed] a patent and fundamental unfairness that amount[ed] to a violation of due process.' " (*Id.* at pp. 509-510.) Plaintiffs there also argued that the city was estopped from claiming that a voting threshold below two-thirds governed the enactment of the measure. (*Id.* at p. 510.) Citing *Hass*, the trial court granted the plaintiffs judgment on the pleadings in part because "voters had been told that passage required a two-

19

thirds vote, and allowing the measure to go into effect with fewer votes would amount to a 'fraud on the voters.' " (*Ibid.*)

The Court of Appeal reversed the trial court. It "acknowledge[d] the critical importance of true and impartial ballot materials" and recognized that "voters are entitled to be given a true and impartial summary of initiative measures." (*Jobs & Housing*, *supra*, 73 Cal.App.5th at pp. 511, 512.) But, distinguishing the measure from the ordinance in *Hass*, the *Jobs and Housing* court pointed out that the measure at issue, "unlike the measure in *Hass*, did not include a voting threshold in its text." (*Id.* at p. 516.) It explained that "even accepting that incorrect statements in ballot materials might affect some voters, [it] disagree[d] that this possibility rendered the enactment of [the measure] a fraud on the voters." (*Ibid.*) It further explained that the inclusion of a voting threshold in the text of the proposed ordinance "*establishes* the applicable law for that measure," but "[a] voting threshold identified in ballot materials cannot supplant the law governing the appliable voting threshold." (*Id.* at p. 517.) We find the opinion in *Jobs & Housing* persuasive, and we follow it.

The trial court here concluded Measure C was comparable to the redistricting ordinance in *Hass* and found that Ordinance No. O-21143, which placed Measure C on the ballot and stated the measure required a two-thirds majority, conditioned passage on a two-thirds majority vote. The recitals in Ordinance No. O-21143 explained the City's understanding of the law at the time it adopted it, stating that Measure C was "a special tax, and thus the initiative measure requires approval by a two-thirds majority of the local electorate to be adopted by the voters; . . . ." Ordinance No. O-21143 also stated that "[p]assage of this measure requires the affirmative vote of two-thirds of those qualified electors voting on the matter at the Municipal

20

Special Election." The trial court viewed that language as "law of the City" because the city voted to submit Measure C to the voters via the ordinance.

But Ordinance No. O-21143 was the city council's ministerial act to place Measure C on the ballot. (See *Fresno*, *supra*, 59 Cal.App.5th at p. 229 [commenting that the resolution submitting measure to voters stated a two-thirds vote of electorate was required ministerial act]; see also Elec. Code, § 9215 [requiring legislative body to adopt ordinance or submit ordinance to voters]; San Diego Mun. Code, § 27.1034 [requiring city council to adopt or reject legislative act as presented by initiative petition where petition contains signatures of 10 percent of more of voters].) Ordinance No. O-211433 did not, like the citizen-created ordinance in *Hass*, establish an applicable law for the measure because the city council's ordinance could not supplant the governing law. (See *Jobs & Housing*, *supra*, 73 Cal.App.5th at p. 517.) Further, the ordinance did not incorporate the two-thirds vote requirement directly into Measure C the way the ordinance did in *Hass*. (*Jobs & Housing*, at p. 517.) Measure C, unlike the ordinance before the electorate in *Hass*, did not state a threshold requirement for voter approval; it required only "approval by the voters," in section 7. Thus, we apply to the election of Measure C the voter threshold applicable to a citizens' initiative, a simple majority.

C. *Declaring the Passage of Measure C Based on a Simple Majority Vote Did Not Violate Due Process or Constitute "Fraud on the Voters"*

Opponents argue the City violated due process because the election was conducted under one set of rules and the City then changed the rules after the election.

California courts " 'have recognized the "possibility" that an impartial analysis of a county measure or other ballot materials can be so misleading and inaccurate "that constitutional due process requires invalidation of the

21

election." ' " (*Jobs & Housing*, *supra*, 73 Cal.App.5th at p. 512.) When there is an allegation that there are omissions, inaccuracies, or misleading statements in the ballot materials, due process " 'depend[s] on whether the materials, in light of other circumstances of the election, were so inaccurate or misleading as to prevent the voters from making informed choices.' " (*Id.* at p. 513, quoting *Horwath v. East Palo Alto* (1989) 212 Cal.App.3d 766, 777-778.) " '[C]ourts should take into account the materiality of the omission or other informational deficiency. Flaws striking at the very nature and purpose of the legislation are more serious than other, more ancillary matters.' [Citation.]" (*Horwath*, at p. 778.) Considerations include the extent of preelection publicity, canvassing and other informational activities, the availability of the ordinance text, and the official dissemination and content of other materials, like arguments for or against the measure. (*Ibid.*)

In *Jobs & Housing*, the court applied the *Horwath* factors and concluded that the "ballot materials provided extensive, unchallenged, information about the substantive content and effect of the measure." (*Jobs & Housing*, *supra*, 73 Cal.App.5th at p. 514.) There was no dispute that voters were given "true and impartial information about the substance of the proposed tax and how and where the proceeds would be distributed"; the "voting-threshold statements did not strike 'at the very nature and purpose of the legislation,' " and instead concerned a " 'more ancillary matter[ ].' [Citation.]" (*Ibid.*) The court also recognized the voting threshold statements occurred when there was legal uncertainty about the proper threshold for citizens' initiatives for special taxes. (*Id.* at p. 514.) Ultimately, it concluded that the measure could not be invalidated on due process grounds, even though the ballot materials indicated the measure required two-thirds of the

22

vote to pass, and the government later took a different position. (*Id.* at pp. 514-515.)

Like the appellate court in *Jobs & Housing*, we conclude the conduct here does not warrant invalidating Measure C. The opponents do not contend voters did not receive impartial information about the substance of Measure C, including where the proceeds would be distributed. (See *Jobs & Housing, supra,* 73 Cal.App.5th at p. 514.) They also do not contend the misinformation about the voter threshold struck at the measure's very purpose. (*Id.* at p. 513.) The misinformation occurred only above the measure's official title and summary and in the ballot summary. Moreover, the voter threshold statements here, like in *Jobs & Housing,* occurred when there was uncertainty about the proper threshold for a citizen initiative for special taxes because of trial court decisions on the issue. (See *id.* at p. 514.) Accordingly, we do not invalidate Measure C on due process grounds.

Alliance compares this situation to ones in which states have changed their method of counting individual votes after the elections were held, citing, among other cases, *Roe v. Alabama* (11th Cir. 1995) 43 F.3d 574 (*Roe*) and *Griffin v. Burns* (1st Cir. 1978) 570 F.2d 1065 (*Griffin*), which regarded the procedures for counting absentee ballots.

In *Roe,* an Alabama statute required notarization of absentee ballots for them to count, a procedure that had been acknowledged and followed for years. (*Roe, supra,* 43 F.3d at pp. 580-581.) The appellate court found the challenged ballots did not comply with the state law and including them in the count was contrary to the statewide practice, so it constituted a retroactive change in the election law. (*Id.* at p. 580.) It also implicated due process, disenfranchising those who did not vote based on the inconvenience of the notarization requirement. (*Id.* at p. 581.)

23

*Griffin* represented the opposite situation. There, Rhode Island law permitted absentee and shut-in voting in elections but did not explicitly apply to party primaries. (*Griffin, supra,* 570 F.2d at p. 1066.) Election officials believed the use of such ballots was authorized and supplied them for seven years before a losing candidate challenged their validity. (*Id.* at p. 1067.) The appellate court concluded it was unreasonable to expect a voter to question the state officials' issuance of the absentee ballots when no candidate or voter challenged the procedure before the election and the use of such ballots followed longstanding practice. (*Id.* at pp. 1075-1076.) Because the procedure induced voters to use the absentee method, discounting their ballots would have stripped those voters of their votes in the primary. (*Id.* at p. 1074.)

These cases are not like the one before us. The opponents do not contest the efficacy of the election here or otherwise suggests the City failed to count each vote cast. The City did not agree to count certain votes before the election and then exclude them once the election was over. Nor did it historically exclude ballots that failed to comply with election regulations and suddenly include them in the final count to achieve a preferred outcome. Here, no individual voter's vote was discounted. Thus, these cases are not helpful.

HJTA also addresses the possibility that the City's conduct here constitutes "fraud on the voters," a phrase taken from *Hass.* The *Hass* court commented: "Since the entire ordinance was rejected, the provision that the unconstitutionality of one part should not affect the remainder was not adopted. It would be a fraud on the voters to rule otherwise, after they have voted upon an ordinance submitted to them upon a definite condition." (*Hass, supra,* 139 Cal.App.2d at p. 76.) But the court there did not detail

what constitutes "fraud on the voters" beyond ignoring terms contained within a measure that governed the election outcome. (*Ibid.*) This view assumes the ordinance itself, i.e., the substance of a measure, places a requirement on the voting threshold that is later dishonored. (See *Jobs & Housing, supra*, 73 Cal.App.5th at p. 516.) As we have explained, that is not the case here.

Jobs & Housing also addressed the theory of fraud found in Civil Code section 1572. Like HJTA, we are not convinced *Hass*'s reference to "fraud on the voters" was anything more than its concern that voters were asked to vote "on the basis that a three-fourths vote was required" but then evaluated the outcome on a different basis. (*Hass, supra*, 139 Cal.App.2d at p. 76.) But, if we were to adopt the same approach as the court in *Jobs & Housing* and consider whether the City engaged in fraud, we would be hard pressed to find an intentional misrepresentation, i.e., a statement of a fact known to be untrue by the person who makes it. (*Jobs & Housing, supra*, 73 Cal.App.5th at p. 517.) We agree with the *Jobs & Housing* court that the voting threshold statements "must be viewed in the context of the evolving legal landscape surrounding citizens' initiatives for special parcel taxes." (*Id.* at p. 517.) Given that context, like the *Jobs & Housing* court, we could not ascribe fraudulent intent to government officials because the legal landscape changed between the time when the ordinance placed Measure C on the ballot and when the election occurred. (See *Jobs & Housing*, at pp. 517-518.)

If intentional misrepresentation is necessary, HJTA asks us to adopt a different requirement for intent, offering a definition found in Evidence Code section 623. That section allows a conclusive presumption when a party's statement or conduct intentionally and deliberately leads another to believe a particular thing to be true and to act upon such a belief. One case explains it

25

as an estoppel *in pais*, which is a "rule [that] a person may not lull another into a false sense of security by conduct causing the latter to forebear or do something which he otherwise would have done and then take advantage of the inaction caused by his own conduct." (*Lovett v. Point Loma Development Corp.* (1968) 266 Cal.App.2d 70, 75-76.) Even if we were to apply this rule, it is not clear how the City's erroneous statement in ballot materials about the voter threshold would cause a voter *not to vote* against a measure.

We disagree with HJTA's evaluation that *Concerned Citizens v. City of Carlsbad* (1988) 204 Cal.App.3d 937 (*Concerned Citizens*) is helpful to its position. In *Concerned Citizens*, voters were faced with two propositions regulating residential growth, Propositions E and G. (*Concerned Citizens*, at p. 939.) Proposition E contained a section that explicitly stated it was inconsistent with Proposition G. (*Concerned Citizens*, at p. 940.) After both propositions received a majority vote, the city council enacted the proposition that received the most votes. (*Ibid.*) *Concerned Citizens* argued that the two propositions were consistent, even though Proposition E stated explicitly that it was inconsistent with the terms outlined in Proposition G. (*Concerned Citizens*, at p. 940.) A panel of our court explained that the state Constitution and the Elections Code contemplate elections in which people must choose between conflicting proposals, and Proposition E gave voters notice of the conflict, which "assist[ed] voters in making an intelligent and informed decision." (*Concerned Citizens*, at p. 943.) We refused to amend the proposition and strike the section stating there was an inconsistency because taking that action would have "disenfranchise[d] all those Carlsbad residents who voted for both propositions on the premise that only one would be enacted." (*Ibid.*) Like the situation in *Hass*, in *Concerned Citizens*, the measure itself contained the limitation. In contrast here, as we explained

26

*ante*, the substance of Measure C did not create any requirement that two-thirds approval was necessary.

D. *Any Elections Code Violation Does Not Warrant Invalidating Measure C*

Alliance contends that the City violated the Elections Code by "refus[ing] to 'declare' the result of the election" and delaying stating whether Measure C passed until April 2021.

Section 10262 requires the elections official to conduct the canvass, which is governed by sections 15302 and 15303. "Upon the completion of the canvass, the elections official shall certify the results to the governing body." (§ 12062.) The canvass must be completed no later than the fourth Friday after the election (§ 10262, subd. (a)), and for a consolidated election, the city elections official shall certify the results to the governing body, and the governing body must comply with the applicable provisions of section 10263 no later than the next regularly scheduled city council meeting after the 28-day canvass or at a special city council meeting called for the purpose of complying with section 10263. (§ 10262, subd. (b).) Section 10263 requires the governing body to adopt a resolution that recites "the fact of the election and the other matters that are enumerated in section 10264." When there is a consolidated election, the governing body "declare[s] the results and . . . install[s] the newly elected officers." (*Id.*, subd. (a).)

Section 10264 enumerates matters that the governing body must include in its resolution, pursuant to section 10263. It states: "As soon as the result of the election is declared, the elections official of the governing body shall enter on its records a statement of the result. [¶] That statement shall show: [¶] (a) The whole number of votes cast in the city. [¶] (b) The names of the persons voted for. [¶] (c) The measures voted upon. [¶] (d) For what office each person was voted for. [¶] (e) The number of votes given at each

27

precinct to each person and for and against each measure.  [¶]  (f) The number of votes given in the city to each person and for and against each measure."  (§ 10264.)

San Diego Municipal Code section 27.0411 similarly requires the city clerk, immediately after the election to "cause a canvass of the *election returns*" and "certify the results of the canvass to the *City Council*, which shall have entered in its records the following:  [¶]  (a) The whole number of votes cast in the City;  [¶]  (b) The names of the *candidates* and the office each sought;  [¶]  (c) The *measure* presented; and  [¶]  (d) The number of votes cast for each *candidate* and for and against each *measure*."

After the election was held on March 3, 2020, the city clerk certified the results, stating that "for said proposition the vote was 239,024 (65.24%)," and "[a]gainst said proposition the vote was 127,349 (34.76%)."  Her certification also stated that "the total vote was 366,373" and the "proposition requires a two-thirds majority to be adopted by the voters."  The city clerk's Certificate included all the components required by section 10263.

The April 2020 Resolution indicated the canvass of the election was completed and stated that the city clerk certified the results to the city council.  It also stated that "declaring the results of a municipal election as certified by the . . . City Clerk is a ministerial act required by California Elections Code section 10263."  The April 2020 Resolution complied with the technical content requirements of sections 10262 and 10263 and San Diego Municipal Code section 27.0411 by including the total number of votes cast regarding Measure C, as well as those specifically for and against it, and in so doing it declared the numeric results of the election.  However, instead of taking a position about whether Measure C passed, the resolution explained that "the City Attorney determined that Measure C requires a two-thirds

28

vote for approval" and "acknowledge[d] that there exists in California a split of authority as to whether a majority vote or a supermajority is required for the passage of a special tax by citizens' initiative . . . . It is anticipated that the California Supreme Court will issue a final decision in the future resolving this ambiguity, and that their decision may impact this Measure."

In the April 2021 Resolution, the City declared that Measure C was approved in the March 3, 2020 election. Alliance contends the delay violated section 10263 because the declaration came too late. It asks us to reverse the passage of Measure C based on the delay, even though the law required a simple majority and the measure received more than 64 percent of the vote.

The opponents here could have challenged the April 2020 Resolution for failing to declare the outcome of Measure C, and they chose not to.[9] This may be because, like the City, opponents recognized the changing legal landscape. It could be that the opponents were hopeful that appellate courts would conclude citizens' initiatives require two-thirds of the votes to pass. Whatever opponents' reasons for failing to challenge the City's (in)action in court, we have concluded that Measure C, as a citizens' initiative, was subject to a simple majority vote. We will not now undo the will of the voters based on a delay that resulted in protecting the citizens' initiative power.

CTAN contends that Measure C placed authority to certify the passage of Measure C with the city clerk and not the city council, so the city council lacked the authority "to alter the City Clerk's certification of the results" under the "law of the measure" and did not have discretion to declare it passed. Section 7 of Measure C states that "[u]pon approval by the voters,

9    Section 16100 provides six months to contest an election based on several possible problems with the election or with candidate eligibility, and it provides 30 days for other challenges. (See also § 16401 [contestant challenging results].)

29

the City Clerk shall certify to the passage and adoption of this Ordinance and shall cause it to be published according to law." This means Measure C required the voters to approve it before the city clerk could certify its passage and adoption, but it does not state that the city clerk could determine whether the voters had approved it. Consistent with the Elections Code requirements, the Certificate provided the total vote, the number of votes and percentage of the total "[f]or said proposition," and the number of votes and percentage of the total "[a]gainst said proposition." It also stated, "This proposition requires a two-thirds majority to be adopted by the voters." But it did not state that the voters had approved the measure or that it passed. Because the Certificate did not certify the passage or failure of the measure, there was nothing for the city council to alter.

Furthermore, as the City explains, the San Diego Municipal Code directs the city clerk to "cause a canvass of the *election* returns" and to "certify the results of the canvass to the City *Council*." (San Diego Mun. Code, § 27.0411.) The canvass requires entry of the whole number of votes, the measure presented, and the number of votes cast for and against the measure. (*Ibid.*) Thus, the San Diego Municipal Code, like the Elections Code, vests the city clerk with the responsibility to certify the vote tallies to the city council, but it does not direct the city clerk to determine the legal effect of a vote. (See *ibid.*) Here, even considering section 7 of Measure C, the city clerk could not certify the passage and adoption of the ordinance or cause it to be published because the city council had not yet determined the outcome of the election.

E. *Measure C Does Not Violate Proposition 219*

The interpretation of a statute is a question of law, subject to de novo review. (*Goodman v. Lozano* (2010) 47 Cal.4th 1327, 1332.) We begin by

looking at the language of the provision itself. "[W]e first analyze provisions' text in their relevant context, which is typically the best and most reliable indicator of purpose. [Citations.] We start by ascribing to words their ordinary meaning, while taking account of related provisions and the structure of the relevant statutory and constitutional scheme. [Citations.] If the provisions' intended purpose nonetheless remains opaque, we may consider extrinsic sources, such as an initiative's ballot materials. [Citation.]" (*California Cannabis*, *supra*, 3 Cal.5th at pp. 933-934.)

Proposition 219 amended the article II, section 11 to add subdivision (b), which provides: "A city or county initiative measure may not include or exclude any part of the city or county from the application or effect of its provisions based upon approval or disapproval of the initiative measure, or based upon the casting of a specified percentage of votes in favor of the measure, by the electors of the city or county or any part thereof."[10] HJTA asks us to read Proposition 219 to require uniform application of a tax rate to all overnight facilities, regardless of geographical location. The City and Yes Committee concede that Measure C does not apply uniform tax rates to all overnight lodging facilities but contend that is not what Proposition 219 requires. They argue that Proposition 219 requires a government to apply provisions of a measure regardless of which regions approved or disapproved it in an election. Each position is supportable by the plain language in the proposition.

Highlighting the language that a measure may not include or exclude any part of a city or county from its provisions' application or effect, HJTA focuses on the first part of article II, section 11, subdivision (b), which states,

---

[10]    Although the City explains its compliance with article II, section 11, subdivision (c) in its appeal, we do not address it in detail because opponents do not argue Measure C violates it.

31

"A city or county initiative measure may not include or exclude any part of the city or county from the application or effect of its provisions based upon approval or disapproval of the initiative measure, . . . ." HJTA argues that Proposition 219 applies when the electors of the city "approve a measure which includes or excludes parts of the city from application and effect." Thus, any time a measure applies differently based on geography, it violates Proposition 219. Instead, HJTA contends, a tax rate must apply uniformly to every portion of the city or county once the measure is approved.

The City and Yes Committee urge a different reading of the text. They explain that Proposition 219 prohibits the application or effect of provisions in an initiative measure from applying to only a portion of a city or county *based on* the measure's approval or disapproval by electors in a portion of the city or county. They assert that an initiative's provisions cannot be applied to part of a city based on which portion of the electors approved it, and it cannot be applied based on achieving a certain percentage of electors in a subarea of the city or county. Put differently, an initiative measure could include or exclude a portion of the city or county from the provision's application or effect as long as inclusion or exclusion is not a consequence of its approval or disapproval by a portion of the city or county's voters.

The City and Yes Committee also challenge HJTA's understanding of Proposition 219's language. They argue that reading a uniform geographical requirement into the proposition's meaning ignores some of the proposition's language because it does not consider the application or effect of a tax "based upon . . . [its] disapproval," since a measure's provisions would have no effect if disapproved. They also argue HJTA's understanding fails to incorporate the phrase "by the electors of the city or county or any part thereof" because it would not matter which of a city's or county's electors approved or

32

disapproved of the initiative measure or voted in a particular way if the only consideration is the measure's approval or disapproval. Thus, they contend, HJTA's interpretation fails to give meaning to all the words, treating some as surplusage. (See *Agnew v. State Board of Equalization* (1999) 21 Cal.4th 310, 330 ["[C]ourt should avoid construction that makes some words surplusage"].)

Because the construction of the statute creates some ambiguity and our role is to effectuate the intent of the legislation, we turn to the ballot measure materials to aid us. The Legislature placed Proposition 219 on the ballot in June 1998. The Analysis by the Legislative Analyst explained how most ballot measures functions "In most cases these ballot measures apply to *all* areas within the state or a local community in the same way. For example, if a statewide measure passes, it applies to all counties in the same way, regardless of whether a majority of voters in any individual county approved the measure." (Ballot Pamp., Primary Elec. (June 2, 1998) analysis of Prop. 219 by Legis. Analyst, p. 6.) It identified a November 1993 proposition (Proposition 172) that enacted a statewide sales tax that provided revenues only to the counties that "voted in favor of the measure."[11]

In response, Proposition 219 would require a "ballot measure to apply in the same way in all parts of the jurisdiction (that is the state or a local government) affected by the measures, regardless of how any individual part

_____

[11]    It also pointed to a more recent, local measure that provided that if the measure were approved by a majority, it would enact a tax for general purposes, and if two-thirds of voters approved it, it would enact a tax for special purposes. Thus, a "yes" vote could mean two different things. (Ballot Pamp., Primary Elec. (June 2, 1998) analysis of Prop. 219 by Legis. Analyst, p. 6.) That example applies to the language in article II, section 11, subdivision (c).

of that jurisdiction voted."[12]  (Ballot Pamp., Primary Elec. (June 2, 1998) analysis of Prop. 219 by Legis. Analyst, p. 6.)  The argument in favor of Proposition 219 described the November 1993 measure as "contain[ing] a provision to extort voters into supporting it" because "only those counties which voted in [the] hike would be able to receive the new police and fire protection revenues."  (*Id.* at p. 7, capitalization omitted.)  It urged voters to support Proposition 219 to "prohibit political discrimination against the residents of a city, county or other local jurisdiction just because they voted for or against a particular ballot measure," and because it would  "guarantee benefits of all ballot measures [would] be provided fairly to the people of every community in California" and protect the rights "of California voters to cast their ballots without fear of political revenge, intimidation or blackmail."[13]  (*Ibid.*, capitalization omitted.)  Thus, it is clear from the ballot materials that the purpose of Proposition 219 was to ensure that the way a particular county or city voted in a statewide election, or a portion of a county or city voted in a local election, must have no impact on whether a measure's provisions apply to or affect that subarea.  While HJTA concentrates on the first part of that calculus, emphasizing that measures must "apply in the same way in all parts of the jurisdiction (that is, the state or a local government) affected by the measures," that is an incomplete view of the

---

[12]    It also prohibited "measures from containing alternative or additional provisions that would be enacted depending on the percentage of votes cast in favor of the measure."  "Thus, a ballot measure could not apply only in those areas that voted in favor of the measure."  (Ballot Pamp., Primary Elec. (June 2, 1998) analysis of Prop. 219 by Legis. Analyst, p. 6.)

[13]    There was no argument against Proposition 219 filed.  (Ballot Pamp., Primary Elec. (June 2, 1998) analysis of Prop. 219 by Legis. Analyst, at p. 7.)

34

proposition, which was focused on ensuring that the way any part of a jurisdiction votes must not impact the measure's application or effect. (*Id*. at p. 6.)

Measure C creates three zones with three different tax rates. The highest increase, 3.25 percent, would be placed on visitors staying at facilities in the general vicinity of downtown San Diego. More central facilities would impose a 2.25 percent increase in the transient occupancy tax, and facilities at the far northern and southern portions of the city would see increased tax rates of 1.25 percent. Although Measure C applies three different tax rates to overnight lodging facilities based on their geographical locations within the city, the taxes are not influenced by which electors within the city voted in its favor. Further, the revenue from those taxes is also not distributed based on how parts of the city voted. Thus, whatever our views about the propriety of charging different tax rates based on the geography of an overnight facility within the city,[14] we conclude Measure C does not violate Proposition 219.

F. *We Remand the Matter for Further Consideration of Whether Measure C is a Citizens' Initiative*

1. Additional Facts

CTAN answered the City's validation complaint with an affirmative defense that Measure C was a negotiated, sponsored, supported, and promoted city-sponsored initiative, so it was not a citizens' initiative, and the

[14] Opponents of Measure C did not challenge its validity on the basis that it improperly draws classes of overnight lodging facilities based on geography. Accordingly, we do not address whether the non-uniform nature of the overnight facilities tax implicates other laws. (See *California Association of Retail Tobacconists v. State of California* (2003) 109 Cal.App.4th 792, 841-844 ["Differing tax rates may be imposed upon different classes provided the classification created is reasonable".])

35

two-thirds voting threshold applies. The primary basis of this argument appears to be that Jaymie Bradford was the executive vice-president and chief operating officer of the San Diego Regional Chamber of Commerce, as well as a principal organizer, proponent and treasurer for the Yes! for a Better San Diego campaign committee, while she was a member of the board of directors of the San Diego Convention Center Corporation, which is a wholly-owned subsidiary of the City. CTAN alleges that Bradford brought the resolution to support Measure C to the San Diego Convention Center Corporation board of directors, sought its approval, and voted to approve a resolution in support of Measure C. She also allegedly boosted for Measure C while holding herself out as a member of the convention center board. CTAN moved to depose Bradford and the custodian of records for the San Diego Regional Chamber of Commerce. The City moved to quash those depositions.

Bradford's name appears on the list of Measure C's proponents, incorporated into Ordinance No. O-21143, placing Measure C on the ballot. She indicated she was the executive vice-president and chief operating officer of the San Diego Regional Chamber of Commerce.

The trial court did not address whether Measure C is a citizens' initiative, and it did not rule on the motion to quash the subpoenas.

### 2. Analysis

We have assumed for purposes of our analysis in this opinion that Measure C is a citizens' initiative.[15] CTAN challenges this assumption but asks us to remand this issue because "neither the merits nor any evidence or

---

[15]    We do not address Alliance's claims in footnote 4, which focus on arguments for why we should not direct the court to enter judgment in favor of the City, because they regard us directing judgment in favor of the City, an action which we do not take.

36

facts related to [this] affirmative defense are properly before this [c]ourt." The City contends that CTAN's position has been rejected in *Proposition G.*

In *Proposition G*, the appellate court found irrelevant that the proposition's proponents did not draft the ballot materials or fund the filing fees themselves, explaining the law does not prohibit a government from publicly expressing support for a ballot measure. (*Proposition G*, *supra*, 66 Cal.App.5th at p. 1081.) It found the argument that the official proponents did not play a sufficiently active role in securing the measure's approval to be "nebulous and legally unsupported." (*Id.* at p. 1082.) Thus, the fact of a government official's involvement in an initiative does not necessarily convert a voter initiative into a local government initiative without more.[16]

But too much government involvement can mean an initiative is really presented by the local government. For example, in *Rider*, *supra*, 1 Cal.4th at pages 8-11, the Supreme Court considered evidence to evaluate whether an agency was really a special district, because tax impositions would then require a two-thirds majority vote. A panel of our court concluded there was ample evidence demonstrating that the San Diego County Board of Supervisors had acted to circumvent the intent behind Proposition 13 by

---

[16] We do not find *Boling v. Public Employment Relations Board* (2018) 5 Cal.5th 898 helpful. There, unions filed an unfair practice claim after the San Diego mayor refused to meet and confer with them regarding an initiative to eliminate defined-benefit pensions for new city employees, which the mayor drafted and promoted. (*Id.* at pp. 903-904.) The Supreme Court held that the Meyers-Milias-Brown Act (MMBA) imposes a meet and confer duty on the governing body and administrative officers or other representatives of that body. (*Id.* at pp. 917-918.) Because the mayor was the designated labor negotiator, he was required to meet and confer with the unions before determining a policy or course of action on issues that affected that terms and conditions of employment. (*Id.* at p. 918.) The mayor's failure to do so violated the MMBA. (*Id.* at pp. 918-919.) The case was not focused on whether the initiative qualified as a citizens' initiative.

establishing an agency over which it retained substantial control. (*Rider*, at pp. 8-11.)

From these cases, we understand that a government official's involvement must demonstrate substantial control for an initiative to be deemed a government action rather a citizens' initiative. Here, the record indicates there were several citizen proponents of Measure C, and the measure received the requisite public support to warrant placing it on the ballot as a citizens' initiative. It is not clear whether Bradford's involvement suggests her government agency retained substantial control over the initiative process or otherwise acted in a way that shows Measure C was not a "bona fide citizens' initiative." This affirmative defense is simply too underdeveloped at this point for us to reach the merits. Thus, we direct the trial court to consider this issue on remand.

## DISPOSITION

The judgment is reversed. The matter is remanded to the superior court with instructions to proceed in a manner consistent with this opinion. The parties are to bear their own costs on appeal.

HUFFMAN, Acting P. J.

WE CONCUR:

O'ROURKE, J.

DO, J.